[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 11-14532; 11-14674
_____

D.C. Docket No. 2:11-cv-02746-SLB

UNITED STATES OF AMERICA,

Plaintiff - Appellant
Cross Appellee,

versus

STATE OF ALABAMA,
GOVERNOR OF ALABAMA,

Defendants - Appellees
Cross Appellants,

NATIONAL FAIR HOUSING ALLIANCE, INC.,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

(August 20, 2012)

Before WILSON and MARTIN, Circuit Judges, and VOORHEES,[*] District Judge.

WILSON, Circuit Judge:

On June 9, 2011, Governor Robert Bentley signed into law House Bill 56, titled the "Beason–Hammon Alabama Taxpayer and Citizen Protection Act" (H.B. 56). The stated purpose of the legislation is to discourage illegal immigration within the state and maximize enforcement of federal immigration laws through cooperation with federal authorities. *See* Ala. Code § 31-13-2. A total of ten provisions of H.B. 56 are at issue in the appeal before us,[1] some of which have been amended by an act of the Alabama legislature, House Bill 658 (H.B. 658), which Governor Bentley signed into law on May 18, 2012.

Section 10[2] of H.B. 56 creates a new state crime for an unlawfully present alien's "willful failure to complete or carry an alien registration document." Ala. Code § 31-13-10(a). An unlawfully present alien violates section 10 when he or she is found to be in violation of 8 U.S.C. §§ 1304(e) or 8 U.S.C. § 1306(a), the

---

[*] Honorable Richard L. Voorhees, United States District Judge for the Western District of North Carolina, sitting by designation.

[1] Additional provisions have been challenged in the related case involving private plaintiffs, Case Nos. 11-14535 and 11-14675. Those additional sections are described in that companion opinion.

[2] Consistent with how this case has been presented, we reference the originally designated sections of H.B. 56 rather than the Alabama Code section where the provisions are currently housed.

federal provisions governing alien registration.  A violation of this provision carries with it a fine of up to $100 and not more than thirty days in prison.  Ala. Code § 31-13-10(f).

Section 11 criminalizes an "unauthorized" alien's application for, solicitation of, or performance of work, whether as an employee or independent contractor, inside the state of Alabama.  Ala. Code § 31-13-11(a).  An alien who is authorized to work within the United States is not subject to penalty under this provision, *id.* § 31-13-11(d), and section 11 is otherwise construed as consistent with 8 U.S.C. § 1324a, *id.* § 31-13-11(j).  The United States has challenged the criminalization of the underlying conduct described in subsection (a).

Through section 12, Alabama requires officers to determine a lawfully seized individual's immigration status when the officer has reasonable suspicion that the seized individual is unlawfully present in the United States.  *Id.* § 31-13-12(a).  The immigration-status determination is made pursuant to a request under 8 U.S.C. § 1373(c).  *Id.*  A similar request is required for any alien arrested and booked into custody.  *Id.* § 31-13-12(b).

Section 13 creates three new state crimes similar to those codified in 8 U.S.C. § 1324(a)(1)(A).  First, it criminalizes the concealment, harboring, or shielding from detection of any alien, as well as any attempt to do so.  Ala. Code

3

§ 31-13-13-(a)(1). Second, it criminalizes the act of encouraging or inducing an alien to "come to or reside in" Alabama. *Id.* § 31-13-13(a)(2). Third, it criminalizes transporting, attempting to transport, or conspiring to transport an alien "in furtherance of the unlawful presence of the alien in the United States." *Id.* § 31-13-13(a)(3). An individual who engages in "conspiracy to be so transported" is also subject to prosecution. *Id.* Each individual crime requires knowledge or reckless disregard of the fact that the alien is unlawfully present, *see id.* § 31-13-13(a)(1)–(3), and H.B. 658 amended the statute to clarify that each crime is to be interpreted consistent with 8 U.S.C. § 1324(a)(1)(A). As originally enacted, section 13 also criminalized certain instances of entering into a rental agreement with an unlawfully present alien. An amendment included in H.B. 658 moved this provision to a different part of the Alabama Code but left it substantively intact. *See* H.B. 658, § 6.

The next two provisions at issue, section 16 and section 17, concern employment of undocumented workers. Section 16 disallows an employer's state tax deduction for wages and compensation paid to an alien unauthorized to work in the United States. Ala. Code § 31-13-16(a). An employer who knowingly fails to comply with this requirement is "liable for a penalty equal to 10 times" the deduction claimed. *Id.* § 31-13-16(b). Section 17 similarly concerns employment,

4

and it labels as a "discriminatory practice" an employer's act of firing or failing to hire a U.S. citizen or an alien authorized to work while the employer simultaneously employs or hires an alien unauthorized to work in the country. *Id.* § 31-13-17(a). An employer who engages in this practice is subject to a state civil action for compensatory relief, *id.* § 31-13-17(b), and the losing party in that action must pay court costs and attorneys' fees, *id.* § 31-13-17(c).

Section 18 amends a state provision governing drivers' licenses, Ala. Code § 32-6-9. The preexisting statute required all drivers to possess a drivers' license and display it upon the request of a proper state official. *Id.* § 32-6-9(a). Section 18 adds that, when a driver is found to be in violation of subsection (a), a reasonable effort must be made within forty-eight hours to determine that driver's citizenship and, if an alien, whether the individual is permissibly present in the country. *Id.* § 32-6-9(c).[3]

Section 27 prohibits state courts from enforcing a contract to which an unlawfully present alien is a party, provided that the other party "had direct or constructive knowledge" of the alien's unlawful presence and that performance of the contract would require the alien to remain in the state for more than twenty-

___

[3] Originally, the statute also required a person arrested under subsection (a) to be taken to a magistrate in the event the officer could not determine whether the arrestee possessed a valid license. H.B. 658 struck that provision.

four hours after its formation. *Id.* § 31-13-26(a). Section 27 does contain exemptions from its scope, including contracts for overnight lodging, purchase of food, medical services, or transportation to facilitate the alien's return to his country of origin. *Id.* § 31-13-26(b). Additionally, any federally authorized contract is outside the scope of section 27, as are any contracts entered into prior to the section's enactment and any contracts for retention of legal counsel. *Id.* § 31-13-26(c); H.B. 658, § 1.

Next, section 28 provides a process for schools to collect data about the immigration status of students who enroll in public school. Schools are required to determine whether an enrolling child "was born outside the jurisdiction of the United States or is the child of an alien not lawfully present in the United States." *Id.* § 31-13-27(a)(1). That determination is made based on the birth certificate of the child. *Id.* § 31-13-27(a)(2). If none is available, or if the certificate reflects that "the student was born outside . . . the United States or is the child of an alien not lawfully present in the United States," then the enrolling child's parent or guardian must notify the school of the "actual citizenship or immigration status of the student under federal law." *Id.* § 31-13-27(a)(3). This notification consists of (a) official citizenship or immigration documentation and (b) an attestation under penalty of perjury that the document identifies the child. *Id.* § 31-13-27(a)(4). If

6

the statutory notification is not provided, then the student is presumed to be "an alien unlawfully present in the United States." *Id.* § 31-13-27(a)(5).

Finally, as originally enacted, section 30 prohibited unlawfully present aliens from entering, or attempting to enter, into a "business transaction" with the state or a political subdivision thereof. *Id.* § 31-13-29(b) (2011), *amended by* H.B. 658, § 1. A business transaction was defined as including "any transaction," except for the application of marriage licenses. *Id.* § 31-13-29(a). As amended by H.B. 658, the provision now prohibits unlawfully present aliens from entering, or attempting to enter, into a "public records transaction" with the state or a political subdivision thereof. H.B. 658, § 1. A public records transaction is defined as applying for or renewing "a motor vehicle license plate," "a driver's license or nondriver identification card," "a business license," "a commercial license," or "a professional license." *Id.* Any person who violates this prohibition, or any person who attempts to enter into a public records transaction on behalf of an unlawfully present alien, can be charged with a Class C felony. Ala. Code § 31-13-29(d).

Several additional provisions also bear on the application and interpretation of H.B. 56 as a whole. Section 2 provides the overall goals and findings of the

7

legislature in enacting the law.[4]  Section 5 prohibits state officials from adopting

any policy that would restrict enforcement of federal immigration law to its full

extent and provides for a civil cause of action to challenge alleged lax enforcement

of the law.  *See id.* § 31-13-5.  Section 6 similarly prohibits state officials from

adopting relaxed enforcement policies with regard to Alabama's own immigration

provisions and provides an analogous civil cause of action.  *See id.* § 31-13-6.

Both of these sections impose a duty on state officials to report violations of

---

[4] Section 2 states in full:

The State of Alabama finds that illegal immigration is causing economic hardship
and lawlessness in this state and that illegal immigration is encouraged when
public agencies within this state provide public benefits without verifying
immigration status.  Because the costs incurred by school districts for the public
elementary and secondary education of children who are aliens not lawfully
present in the United States can adversely affect the availability of public
education resources to students who are United States citizens or are aliens
lawfully present in the United States, the State of Alabama determines that there is
a compelling need for the State Board of Education to accurately measure and
assess the population of students who are aliens not lawfully present in the United
States, in order to forecast and plan for any impact that the presence such
population may have on publicly funded education in this state.  The State of
Alabama further finds that certain practices currently allowed in this state impede
and obstruct the enforcement of federal immigration law, undermine the security
of our borders, and impermissibly restrict the privileges and immunities of the
citizens of Alabama.  Therefore, the people of the State of Alabama declare that it
is a compelling public interest to discourage illegal immigration by requiring all
agencies within this state to fully cooperate with federal immigration authorities in
the enforcement of federal immigration laws.  The State of Alabama also finds
that other measures are necessary to ensure the integrity of various governmental
programs and services.

Ala. Code § 31-13-2.

8

Alabama's immigration laws, and failure to do so could result in a conviction under Ala. Code § 13A-10-2 for obstructing government operations. *Id.* §§ 31-13-5(f), -6(f). The results of Alabama's immigration-enforcement scheme are reported periodically pursuant to section 24, which requires the Alabama Department of Homeland Security to summarize the "progress being made in the effort to reduce the number of illegal aliens in the State of Alabama" in a public report. *Id.* § 31-13-23.

Before the challenged provisions became effective, the United States filed suit seeking to enjoin them on the ground that they are an impermissible attempt to regulate immigration and are, therefore, preempted by federal law. Around the same time, a group of private plaintiffs filed a separate preenforcement challenge to H.B. 56 asserting preemption and other constitutional claims. (Although many of the issues overlap, these appeals are not consolidated, and the case involving the private plaintiffs is resolved in a companion case, Nos. 11-14535, 11-14675.) Along with its complaint, the United States filed a motion for a preliminary injunction to preserve the status quo until final adjudication. The United States sought to enjoin enforcement of sections 10, 11(a), 12(a), 13, 16, 17, 18, 27, 28, and 30. At the time of filing, the private plaintiffs had already filed a motion for a preliminary injunction, and the district court consolidated the two cases for

9

purposes of deciding the preliminary injunction issues.

After briefing and argument, the district court granted in part and denied in part the motions for preliminary injunction. The district court found a likelihood of success in the preemption challenge to sections 11(a), 13, 16, and 17 and enjoined their enforcement; it did not find a likelihood of success in the preemption challenge to sections 10, 12(a), 18, 27, 28, and 30.[5] *United States v. Alabama*, 813 F. Supp. 2d 1282 (N.D. Ala. 2011).

The United States and private plaintiffs appealed the district court's denial of a preliminary injunction, and Alabama cross-appealed the district court's grant of preliminary injunctive relief. After filing its notice of appeal, the United States sought from this court an injunction pending appeal to prevent enforcement of the sections for which the district court denied an injunction. A panel of this court granted in part the motion for injunction pending appeal, enjoining enforcement of sections 10 and 28. Later, after briefing and oral argument, we modified the injunction pending ultimate disposition of this appeal and enjoined enforcement of sections 27 and 30. As a result of the rulings, only two challenged provisions—sections 12 and 18—are currently being enforced, each of which

---

[5] In the case of the private plaintiffs, the district court further found that sections 8, 10(e), 11(e)–(g), and 13(h) should be enjoined. *Hispanic Interest Coal. of Ala. v. Bentley*, ___ F. Supp. 2d ___, No. 11-2484, 2011 WL 5516953 (N.D. Ala. Sept. 28, 2011).

provides for law enforcement inquiries into the immigration status of certain individuals suspected of criminal activity.[6]

Having closely considered the positions and new briefing of the parties in light of the recent decision in *Arizona v. United States*, 567 U.S. ___, 132 S. Ct. 2492 (2012), we conclude that most of the challenged provisions cannot stand. Specifically, we conclude that the United States is likely to succeed on its preemption claims regarding sections 10, 11(a), 13(a), 16, 17, and 27. We therefore affirm the district court's decision as to sections 11(a), 13(a), 16, and 17. We reverse the district court's decision as to sections 10 and 27 and remand for the entry of a preliminary injunction. We conclude, however, that the United States has not at this stage shown that sections 12(a), 18, or 30 are facially invalid. We therefore affirm the district court's decision not to preliminarily enjoin these provisions. Finally, because we find section 28 violative of the Equal Protection Clause in the companion case brought by private plaintiffs, we dismiss the United States's appeal as to this section as moot without deciding whether that provision is preempted. In sum, we affirm in part and reverse in part the order of the district

---

[6] In supplemental briefing following the Supreme Court's decision in *Arizona v. United States*, 567 U.S. ___, 132 S. Ct. 2492 (2012), the United States declared that it will no longer pursue the appeal of sections 12 and 18. Because neither party has requested dismissal of the appeal, we will address the merits of the preemption claim with respect to sections 12 and 18, recognizing the concession of the United States that it will not succeed on those claims.

11

court, and we dismiss in part the appeal.

## I.  Standard of Review

We review a district court's grant of a preliminary injunction for abuse of discretion.  *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).  Legal determinations underlying the grant of an injunction are reviewed *de novo*, and factual determinations are reviewed for clear error.  *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171–72 (11th Cir. 2002).

## II.  Discussion

A preliminary injunction may be granted to a moving party who establishes "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."  *Robertson*, 147 F.3d at 1306.  We address these factors in turn, focusing in particular on the most contested determination—whether the United States is likely to succeed on the preemption claims.

### A.    Likelihood of Success on the Merits

Our Constitution provides Congress with the power to preempt state law, *see* U.S. Const. art. VI cl. 2, and that preemption may be express or implied.

12

Although preemption law cannot always be neatly categorized, we generally recognize three classes of preemption. *See Browning*, 522 F.3d at 1167 (recognizing the doctrines of express, field, and conflict preemption). The first, express preemption, arises when the text of a federal statute explicitly manifests Congress's intent to displace state law. *Id.* The second, field preemption, "occurs when a congressional legislative scheme is 'so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152 (1947)). To determine the boundaries that Congress sought to occupy within the field, we look to "'the federal statute itself, read in the light of its constitutional setting and its legislative history.'" *De Canas v. Bica*, 424 U.S. 351, 360 n.8, 96 S. Ct. 933, 938 (1976) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 78–79, 61 S. Ct. 399, 410 (1941) (Stone, J., dissenting)).

The third, conflict preemption, may arise in two ways. First, conflict preemption can occur "when it is physically impossible to comply with both the federal and the state laws." *Browning*, 522 F.3d at 1167. Conflict preemption may also arise "when the state law stands as an obstacle to the objective of the federal law." *Id.* We use our judgment to determine what constitutes an unconstitutional obstacle to federal law, and this judgment is "informed by

13

examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S. Ct. 2288, 2294 (2000).

In determining the extent to which federal statutes preempt state law, we are "guided by two cornerstones." *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S. Ct. 1187, 1194 (2009). First, "'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 2250 (1996)). Second, we assume "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 565, 116 S. Ct. at 1194–95 (internal quotation marks and alterations omitted); *see also Arizona*, 132 S. Ct. at 2501. With these considerations in mind, we turn to the merits of whether the United States is likely to succeed on its claims that sections 10, 11(a), 12(a), 13, 16, 17, 18, 27, 28, and 30 are preempted by federal law.

1.    Section 10

Section 10 criminalizes an unlawfully present alien's willful failure to complete or carry registration documents in violation of 8 U.S.C. §§ 1304(e), 1306(a). The district court rejected the United States's preemption argument, finding that section 10 is a permissible complement to federal law. This court

14

enjoined enforcement of section 10 pending appeal.  Having the benefit of the

Supreme Court's decision in *Arizona*, we conclude that the district court erred in

finding that the United States was not likely to succeed on its preemption

challenge to section 10.[7]

In *Arizona v. United States*, the Supreme Court recently found preempted

section 3 of Arizona's Senate Bill 1070 (S.B. 1070), which forbade "willful failure

to complete or carry an alien registration document" in violation of 8 U.S.C.

§§ 1304(e) or 1306(a).  132 S. Ct. at 2501 (quoting Ariz. Rev. Stat. § 13-1509(A)).

After identifying the federal statutes that Congress enacted to create the present

alien-registration scheme, the Court concluded that the federal government "has

occupied the field of alien registration."  *Id.* at 2502.  Congress promulgated

standards for alien registration as well as "punishment for noncompliance."  *Id.*

As a result of field preemption, Congress manifestly "foreclose[d] any state

regulation in the area, even if it is parallel to federal standards."  *Id.*

Like section 3 of S.B. 1070, section 10 intrudes into the field of alien

registration, which the Supreme Court has confirmed is an area of exclusive

federal concern.  Because federal law occupies the field, "even complementary

---

[7] In supplemental briefing after *Arizona*, Alabama has acknowledged that section 10 is preempted.

15

state regulation is impermissible." *Id.* As was the case in *Arizona*, any attempt by Alabama to enforce its own requirements would dilute federal control over immigration enforcement and detract from Congress's comprehensive scheme. *Id.* The Court has made clear that a state's shared goal and adoption of federal standards is insufficient to save its statute from a finding of field preemption. *Id.* at 2502–03. The Court's holding that federal alien registration law occupies the field necessarily requires that state regulations in that area are preempted. We therefore conclude, consistent with *Arizona*, that section 10 is preempted by federal law.

2.    Section 11(a)

Section 11(a) criminalizes the knowing application for work, solicitation of work, or performance of work by an alien who is not authorized to work in the United States. The district court enjoined this section on the ground that Congress intended to curb the employment of unauthorized aliens by regulating the actions of employers who hire unauthorized workers, not the employees who acquire these jobs. The Supreme Court concluded in *Arizona* that a nearly identical provision of Arizona law was preempted, and in light of that holding, we agree with the district

16

court.[8]

In *Arizona*, the Supreme Court passed on section 5(C) of S.B. 1070, which made it a state misdemeanor for "an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor" in the state.  132 S. Ct. at 2503 (quoting Ariz. Rev. Stat. § 13-2928(C)).  The Court explained that Congress enacted the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, 100 Stat. 3359, as "a comprehensive framework 'combating the employment of illegal aliens.'" *Arizona*, 132 S. Ct. at 2504 (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147, 122 S. Ct. 1275, 1282 (2002)).  Notably, while federal law contemplates some consequences for unauthorized aliens who accept employment, IRCA "does not impose federal criminal sanctions on the employee side" and instead imposes criminal penalties on employers who hire unauthorized aliens.  *Id.* IRCA's regulatory scheme, along with its legislative history, compelled the Court to conclude that "Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment."  *Id.*; *see also id.* ("IRCA's framework reflects a considered judgment that making criminals

---

[8] In supplemental briefing after *Arizona*, Alabama has acknowledged that section 11(a) is preempted.

out of aliens engaged in unauthorized work—aliens who already face the possibility of employer exploitation because of their removable status—would be inconsistent with federal policy and objectives."). In light of this intent, the Court found that Arizona's law "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens." *Id.* at 2505. As a result, it found section 5(C) preempted by federal law. *Id.*

In light of Congress's decision that "it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment," Alabama's section 11(a) is preempted by federal law. *Id.* Section 11(a) cannot be meaningfully distinguished from the provision at issue in *Arizona*. Both the Alabama and Arizona provisions criminalize the application, solicitation, and performance of work by an unauthorized alien. Ala. Code § 31-13-11(a); Ariz. Rev. Stat. § 13-2928(C). This attempt to criminalize conduct that Congress has chosen not to criminalize presents an obstacle to accomplishment of federal law. *Arizona*, 132 S. Ct. at 2505. As a result, section 11(a) is preempted by federal law.

3.    Section 12(a)

Pursuant to section 12, a state law enforcement officer is obligated to investigate the immigration status of lawfully seized individuals whom the officer has reasonable suspicion to believe is unlawfully present in the United States.

18

Neither the district court nor this court enjoined this section. Following *Arizona*, and consistent with the positions of the parties, we conclude that the United States is not likely to succeed on its challenge to section 12 in this preenforcement challenge.

In *Georgia Latino Alliance for Human Rights v. Deal* (*GLAHR*), No. 11-13044, ___ F.3d ___ (11th Cir. Aug. 20, 2012), we recounted relevant aspects from the recent Supreme Court opinion in *Arizona v. United States*:

> In *Arizona*, the Supreme Court rejected a preenforcement challenge to section 2(B) of S.B. 1070, which requires state officers to make a reasonable attempt to determine the immigration status of a person stopped, detained, or arrested if there exists reasonable suspicion that the detained individual is an unlawfully present alien. 132 S. Ct. at 2507; *see* Ariz. Rev. Stat. § 11-1051(B). The Arizona statute contains three limitations: production of certain identification renders an individual presumptively lawfully present, Ariz. Rev. Stat. § 11-1051(B); officers may not consider race, color, or national origin except as authorized by the United States and Arizona Constitutions, *id.*; and the statute must be implemented consistently with federal law and in a manner protective of civil rights, *id.* § 11-1051(L).

> *Arizona* clarified the principle that "[c]onsultation between federal and state officials is an important feature of the immigration system." 132 S. Ct. at 2508. Pursuant to 8 U.S.C. § 1357(g)(10), state officers may permissibly communicate with the federal government about "the immigration status of any individual," even absent a formalized agreement between the locality and federal government. Moreover, Congress has set up a system to provide assistance to state officers and has mandated that Immigration and Customs Enforcement (ICE) respond to state inquiries concerning the immigration status of individuals. *Arizona*, 132 S. Ct. at 2508.

19

Above all, Congress has "encouraged the sharing of information about possible immigration violations," and federal law permits "a policy requiring state officials to contact ICE as a routine matter." *Id.* The state's failure to incorporate or reference federal enforcement priorities in its immigration-inquiry statute is irrelevant. *Id.*

The Court also explained in *Arizona* that a preenforcement challenge to the scope of detention authorized by the state statute is premature. *Id.* at 2509–10. It noted the potential problems with a state statute that would permit detention "solely to verify [an individual's] immigration status" but noted that the state's interpretation of its statute could remedy these concerns. *Id.* at 2509. In sum, if all the state statute requires is that state officers conduct an immigration inquiry "during the course of an authorized, lawful detention or after a detainee has been released, the provision likely would survive preemption—at least absent some showing that it has other consequences that are adverse to federal law and its objectives." *Id.* Notably, the Court left open the possibility that the interpretation and application of Arizona's law could prove problematic in practice and refused to foreclose future challenges to the law. *Id.* at 2510.

*GLAHR*, Slip Op. at 28–30.

Like the relevant Arizona provision, we are compelled to conclude that this preenforcement challenge to section 12(a) cannot succeed. As the Court confirmed in *Arizona*, it is not problematic to request information explicitly contemplated by federal law. *See Arizona*, 132 S. Ct. at 2508. While we do not foreclose any future challenge to the scope of detention eventually authorized or permitted under section 12(a), at this point we cannot conclude that the state statute "will be construed in a way that creates a conflict with federal law." *Id.* at

20

2510.  As a result, we reject the preenforcement challenge that section 12(a) is preempted by federal law.

### 4.    Section 13

Section 13 creates state crimes for (1) concealing, harboring, or shielding an unlawfully present alien from detection, or attempting to do so; (2) encouraging or inducing an unlawfully present alien to "come to or reside in" Alabama; (3) transporting, attempting to transport, or conspiring to transport an unlawfully present alien, including an alien's conspiracy to be transported; and (4) harboring an unlawfully present alien by entering into a rental agreement with that alien.[9] The district court enjoined operation of this section on the ground it was conflict preempted by the largely analogous provisions of the INA.  Even in light of the recent amendments accomplished by H.B. 658, we agree.[10]

---

[9] Although section 6 of H.B. 658 altered the phrasing of the rental-agreement provision and moved it to another section of the Alabama Code, the parties have stipulated in district court that the preliminary injunction extends to section 6 of H.B. 658.  Our discussion of section 13 therefore encompasses the rental-agreement provision, which is, for purposes of our review, substantively the same as the prior enactment.

[10] Like the parties, we conclude that the challenge to section 13 is not moot in light of H.B. 658.  The statutory amendments merely clarified that section 13 was to be applied consistently with federal law and moved one provision to another part of the Alabama Code.  The United States has argued that section 13 is preempted because it regulates "the same type of conduct already regulated by Congress."  Response Brief of United States at 47.  The amendments, which clarify that section 13 reaches only the conduct proscribed by federal law, do not affect the core preemption challenge lodged by the United States.  *See Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662, 113 S. Ct. 2297, 2301 (1993).

We first look to the intent of Congress to determine the scope of the federal immigration scheme.  In *GLAHR*, we found that federal law "provides a comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens" and summarized the relevant provisions of the INA:

> Pursuant to 8 U.S.C. § 1324(a)(1)(A)(ii)–(iv), it is a federal crime for any person to transport or move an unlawfully present alien within the United States; to conceal, harbor, or shield an unlawfully present alien from detection; or to encourage or induce an alien to "come to, enter, or reside in the United States."  Any person who conspires or aids in the commission of any of those criminal activities is also punishable.  *Id.* § 1324(a)(1)(A)(v).  Section 1324(c) permits local law enforcement officers to arrest for these violations of federal law, but the federal courts maintain exclusive jurisdiction to prosecute for these crimes and interpret the boundaries of the federal statute.  *See id.* § 1329.  Subsection (d) of § 1324 further dictates evidentiary rules governing prosecution of one of its enumerated offenses, and subsection (e) goes so far as to mandate a community outreach program to "educate the public in the United States and abroad about the penalties for bringing in and harboring aliens in violation of this section."  Rather than authorizing states to prosecute for these crimes, Congress chose to allow state officials to arrest for § 1324 crimes, subject to federal prosecution in federal court.  *See id.* §§ 1324(c), 1329.  In the absence of a savings clause permitting state regulation in the field, the inference from these enactments is that the role of the states is limited to arrest for violations of federal law.  *See De Canas*, 424 U.S. at 363, 96 S. Ct. at 940.

> The comprehensive nature of these federal provisions is further evident upon examination of how § 1324 fits within the larger context of federal statutes criminalizing the acts undertaken by aliens and those who assist them in coming to, or remaining within, the United

States.  Regarding the aliens themselves, § 1325, for example, imposes civil and criminal penalties for unlawful entry into the United States.  Congress has similarly authorized criminal penalties for individuals who bring aliens into the United States, *id.* § 1323, aid the entry of an inadmissible alien, *id.* § 1327, and import an alien for an immoral purpose, *id.* § 1328.  In enacting these provisions, the federal government has clearly expressed more than a "peripheral concern" with the entry, movement, and residence of aliens within the United States, *see De Canas*, 424 U.S. at 360–61, 96 S. Ct. at 939, and the breadth of these laws illustrates an overwhelmingly dominant federal interest in the field.

*GLAHR*, Slip Op. at 19–21 (footnote omitted).

We found support for the conclusion that the similar sections of Georgia's immigration law were preempted by looking to the recent *Arizona* decision and *Pennsylvania v. Nelson*, 350 U.S. 497, 76 S. Ct. 477 (1956).

Section 3 of Arizona's Senate Bill 1070 (S.B. 1070) added a "state-law penalty for conduct proscribed by federal law"—the failure to complete and carry alien registration documents as required by 8 U.S.C. §§ 1304(e), 1306(a).  *Arizona*, 132 S. Ct. at 2501.  The Court explained the comprehensive nature of the current federal registration scheme, which holds aliens to certain standards of conduct and penalizes their willful failure to register with the federal government.  *Id.* at 2502.  Based on the breadth of federal regulation, the Court concluded that "the Federal Government has occupied the field of alien registration" and therefore found impermissible "even complementary state regulation" within that field.  *Id.*; *see also id.* ("Even if a State may make violation of federal law a crime in some instances, it cannot do so in a field . . . that has been occupied by federal law.").  The Supreme Court dismissed the state's argument that its goal of concurrent enforcement was appropriate in a field occupied by federal regulation.  *Id.* at 2502–03.  Like the federal registration scheme addressed in *Arizona*, Congress has provided a

23

"full set of standards" to govern the unlawful transport and movement of aliens. *Id.* at 2502. The INA comprehensively addresses criminal penalties for these actions undertaken within the borders of the United States, and a state's attempt to intrude into this area is prohibited because Congress has adopted a calibrated framework within the INA to address this issue. *See id.* at 2502–03.

. . . In *Nelson*, the Court held that Pennsylvania's sedition act, which "proscribe[d] the same conduct" as the federal sedition statute, was preempted by federal law. *Id.* at 499, 76 S. Ct. at 479. As it did in *Arizona*, the Court rejected the state's argument that its purported supplementation of federal law shielded the state statute from federal preemption. *See id.* at 504, 76 S. Ct. at 481; *see also Charleston & W. Carolina Ry. Co. v. Varnville Furniture Co.*, 237 U.S. 597, 604, 35 S. Ct. 715, 717 (1915) ("When Congress has taken the particular subject-matter in hand, coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go."). The Court later discussed that the federal statute's preemptive effect was implied because it occupied "the specific field which the States were attempting to regulate." *De Canas*, 424 U.S. at 362, 96 S. Ct. at 940. The finding of preemption in *Nelson* was further justified because, like here, Congress had not sanctioned concurrent state legislation "on the subject covered by the challenged state law." *Id.* at 363, 96 S. Ct. at 940.

*GLAHR*, Slip Op. at 21–23. Like the Georgia law at issue in *GLAHR*, we similarly conclude that Alabama is prohibited from enacting concurrent state legislation in this field of federal concern.

Furthermore, section 13 undermines the intent of Congress to confer discretion on the Executive Branch in matters concerning immigration. As we explained in *GLAHR*, "[b]y confining the prosecution of federal immigration

24

crimes to federal court, Congress limited the power to pursue those cases to the appropriate United States Attorney.  *See* 8 U.S.C. § 1329; *Arizona*, 132 S. Ct. at 2503 (explaining that if the state provision came into force, states would have 'the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies').  As officers of the Executive Branch, U.S. Attorneys for the most part exercise their discretion in a manner consistent with the established enforcement priorities of the Administration they serve."  *GLAHR*, Slip Op. at 24.  Even though section 13 contemplates consistency with the text of 8 U.S.C. § 1324, its enforcement is noticeably "not conditioned on respect for the federal concerns or the priorities that Congress has explicitly granted executive agencies the authority to establish."  *Id.* (citing Department of Homeland Security Appropriations Act 2010, Pub. L. No. 111-83, 123 Stat. 2142, 2149 (2009), which requires the Secretary of Homeland Security to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime").  Section 13, at the very least, is in tension with federal law.

Also relevant to our finding of conflict preemption, though, are the substantive differences between the federal and state laws.  Like the Georgia law

25

at issue in *GLAHR*, section 13 also

> creates a new crime unparalleled in the federal scheme. Federal law prohibits an individual from encouraging or inducing an alien to "come to, enter, or reside *in the United States*." 8 U.S.C. § 1324(a)(1)(A)(iv) (emphasis added). Once inside the territory, though, it is not (and has never been) a federal crime for a person to encourage an alien to migrate into another state. The Supreme Court has indicated that such additional regulation conflicts with federal law, at least when federal interest dominates. *See Hines*, 312 U.S. at 66–67, 61 S. Ct. at 404 ("[W]here the federal government, in the exercise of its superior authority in th[e immigration] field, has enacted a complete scheme of regulation . . . , states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, *or enforce additional or auxiliary regulations*." (emphasis added)). Similarly, the criminal acts of harboring and transporting unlawfully present aliens constitute an impermissible "complement" to the INA that is inconsistent with Congress's objective of creating a comprehensive scheme governing the movement of aliens within the United States. *See id.*

*GLAHR*, Slip Op. at 26–27.

Still, other provisions of section 13 are more troubling. First, the criminalization of an alien's "conspiracy to be transported," Ala. Code § 31-13-13(a)(3), by its text, appears to prohibit an unlawfully present alien from even agreeing to be a passenger in a vehicle. This provision cannot coexist with § 1324(a), as unlawfully present aliens who are transported "are not criminally responsible for smuggling under 8 U.S.C. § 1324." *United States v. Hernandez-Rodriguez*, 975 F.2d 622, 626 (9th Cir. 1992). Next, the prohibition on

26

"harbor[ing] an alien unlawfully present in the United States by entering into a rental agreement . . . to provide accommodations," H.B. 658, § 6, effectuates an untenable expansion of the federal harboring provision. *See, e.g.*, *United States v. Ozcelik*, 527 F.3d 88, 100 (3d Cir. 2008) (construing "harboring" to encompass conduct tending to "prevent government authorities from detecting the alien's unlawful presence"); *United States v. Myung Ho Kim*, 193 F.3d 567, 574 (2d Cir. 1999) (same); *see also United States v. Chang Qin Zheng*, 306 F.3d 1080, 1086 (11th Cir. 2002) (finding evidence sufficient to convict of harboring where the defendant facilitated the aliens' presence in the United States and "prevented government authorities from detecting the illegal aliens' unlawful presence" (citing *Myung Ho Kim*, 193 F.3d at 574)); *Lozano v. City of Hazleton*, 620 F.3d 170, 223 (3d Cir. 2010) ("[W]e are not aware of any case in which someone has been convicted of 'harboring' merely because s/he rented an apartment to someone s/he knew (or had reason to know) was not legally in the United States."), *vacated*, 131 S. Ct. 2958 (2011) (vacating for further consideration in light of *Chamber of Commerce of the United States v. Whiting*, 563 U.S. ___, 131 S. Ct. 1968 (2011)). Because each of these individual provisions mandates enforcement of "additional or auxiliary regulations" that the INA does not contemplate, they are conflict

27

preempted.[11]  *See Hines*, 312 U.S. at 66–67, 61 S. Ct. at 404.

>       5.       Section 16

Section 16 prohibits employers from deducting as a business expense on their state tax filings any compensation paid to unauthorized aliens.  It imposes a monetary penalty for violation of this provision equal to ten times the deduction, payable to the Alabama Department of Revenue.  The district court found that the United States was likely to succeed on its preemption challenge to section 16, and we agree that it is expressly preempted by 8 U.S.C. § 1324a(h)(2).

Section 1324a, enacted in 1986 as part of IRCA, regulates the employment of aliens unauthorized to work in the United States.  It expressly preempts "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."  8 U.S.C. § 1324a(h)(2).  Alabama does not characterize the statutory denial of a tax deduction as a licensing law but nevertheless contends that section 16 is not preempted.  Therefore our task is to determine whether the statutory prohibition constitutes a "sanction" within the

---

[11] Alabama contends that, if anything, only certain offending sentences of section 13 are preempted.  As we have explained, however, section 13 *in its entirety* is at odds with federal law, both as an enactment within the comprehensive scope of analogous federal provisions, *see Arizona*, 132 S. Ct. at 2502–03, and as legislation in conflict with the INA.

28

meaning of § 1324a(h)(2).

Alabama argues that a "sanction" should be interpreted narrowly and contends that the withholding of a tax deduction is more properly characterized as withholding a sort of reward from an employer.  Neither Congress nor the Supreme Court has precisely delineated the boundaries of what constitutes a "sanction" under § 1324(a)(h)(2).  In interpreting a statute, "we assume that Congress used the words in a statute as they are commonly and ordinarily understood."  *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1212 (11th Cir. 2010).  A sanction is commonly understood to be "a restrictive measure used to punish a specific action or to prevent some future activity."  *Webster's Third New International Dictionary* 2009 (1976).  Notably, a sanction "may take the form of a reward which is withheld for failure to comply with the law."  *Id.*  In its briefs, Alabama itself characterizes the relevant consequence as withholding of a "reward" (i.e. a tax deduction), and that description falls squarely within the common usage of the term sanction.[12]  The obvious goal of section 16 is "to

---

[12] The Supreme Court has likewise instructed that, "[a]s a general matter, the meaning of 'sanction' is spacious enough to cover not only . . . punitive fines, but coercive ones as well, and use of the term carries no necessary implication that a reference to punitive fines is intended." *United States Dep't of Energy v. Ohio*, 503 U.S. 607, 621, 112 S. Ct. 1627, 1636 (1992).  This generality applies with full force here, where Alabama seeks to coerce employers through the withholding of tax deductions and imposition of steep fines when an employer takes those deductions.

prevent some future activity" of an employer—the hiring of unauthorized workers. We are thus persuaded that the ordinary understanding of the term sanction encompasses the section 16 prohibition on tax deductions.

The structure of § 1324a offers further support that the section 16 prohibition is preempted. Congress utilized the word "penalty" to describe civil fines in § 1324a(e)(4)(A), in contrast to use of "sanction" in subsection (h)(2). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) (per curiam)). As the Tenth Circuit stated: "Had Congress intended to preempt only those state laws that are punitive, we would have expected it to use 'penalties' in § 1324a(h)(2). Had it used 'sanctions' in § 1324a(e)(4), we might reach a similar conclusion. It did neither." *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010).

Along those lines, by expressly exempting "licensing and similar laws" from its reach, Congress implicitly recognized that the unqualified statutory term "sanction" was broad enough to cover those types of nonpunitive measures. If

30

Congress had shared Alabama's narrow definition of a sanction, it would not have needed to clarify that licensing laws were permitted, since they would not be contemplated as a sanction in the first place.  Because Alabama's reading would render the licensing exemption superfluous, we do not accept its definition of "sanction."  *See Huff v. DeKalb Cnty.*, 516 F.3d 1273, 1280 (11th Cir. 2008) ("[C]ourts must not interpret one provision of a statute to render another provision meaningless." (quoting *Burlison v. McDonald's Corp.*, 455 F.3d 1242, 1247 (11th Cir. 2006))).  The licensing exclusion and the broader structure of § 1324a thus reinforce our conclusion that Congress intended the term "sanction" to encompass more than simply monetary penalties, in accordance with its ordinary meaning.

Section 16 is functionally indistinguishable from a monetary sanction imposed on persons who employ unauthorized aliens because it denies employers an otherwise available tax deduction on account of an employee's immigration status.  *See* Ala. Code § 40-18-15(a)(1) (permitting deductions for "ordinary and necessary" business expenses as determined in accordance with federal law); *see also* I.R.C. § 162(a)(1) (classifying reasonable salaries paid to employees as an ordinary and necessary business expense).  Denying this deduction has the same effect on an employer as would the imposition of a direct fine.  The means by which Alabama takes money from the employer is a distinction without a

31

difference under these circumstances, and the attempted end-run around

§ 1324a(h)(2)'s express preemption clause is impermissible.  We therefore agree

with the district court that section 16 is preempted.

>        6.      Section 17

Section 17 declares that it is a "discriminatory practice" for an employer to

either fire or fail to hire an individual authorized to work in the United States

while simultaneously employing an unauthorized alien employee.  Ala. Code § 31-

13-17(a).  It provides a civil cause of action for recovery of compensatory

damages related to this "discriminatory practice" as well as court costs and

attorneys' fees for the prevailing party.  *Id.* § 31-13-17(b)–(c).  Section 17 also

instructs that "[t]he court shall consider only the federal government's

determination when deciding whether an employee is an unauthorized alien."  *Id.*

§ 31-13-17(e).  The district court found that, like section 16, this provision is

expressly preempted by 8 U.S.C. § 1324a(h)(2).  We agree.

Alabama's civil-liability scheme acts to deter employers from hiring and

retaining unauthorized aliens.[13]  Section 17 authorizes "restrictive

---

[13] The private nature of the liability is irrelevant.  "[O]nly an arbitrary distinction exists between sanctions initiated by government and those initiated by private individuals.  Civil liability necessarily bears the sanction of government."  1A *Sutherland Statutory Construction* § 20:19 (7th ed. 2009).

measures"—compensatory damages, mandatory attorneys' fees, and mandatory court costs—to punish a "specific action"—hiring or retaining an unauthorized employee. It therefore fits well within the ordinary understanding of a sanction. Although section 17 conditions liability on a prerequisite act—firing or refusing to hire an authorized worker—that requirement does not obviate a finding that this section functions as a sanction. Section 17 at its core is clearly intended to punish the employment of unauthorized aliens, and adding a conjunctive condition that targets specific circumstances under which this behavior will be punished does not change its essence as a sanction.

Our conclusion is in accord with the Tenth Circuit's finding that § 1324a expressly preempted a similar state compensatory statute. *Chamber of Commerce v. Edmondson*, 594 F.3d 742 (10th Cir. 2010). In *Edmondson*, the Tenth Circuit was faced with an Oklahoma law subjecting employers to "cease and desist orders, reinstatement, back pay, costs, and attorneys' fees" if they terminated a legal worker while retaining an unauthorized alien employee. 594 F.3d at 765. In addition to looking at the common understanding of the term "sanction," the Tenth Circuit found instructive the use of that term in other provisions of federal law. *See id.* at 765–66. The court noted that "sanctions" in the Federal Rules of Civil Procedure included in their scope reasonable attorneys' fees, costs, and other

expenses. *Id.* at 766 (citing Fed. R. Civ. P. 11(c)(4), 37(d)(3)). Like section 17, the Oklahoma statute included precisely those punishments described as sanctions in other parts of federal law, which offered further justification that it was expressly preempted by § 1324a.

Alabama analogizes three cases to illustrate that section 17's "compensatory remedies" cannot qualify as § 1324a sanctions. In none of those cases, however, is an employer required to pay on account of his having hired or retained an unauthorized alien; the cause of action in each case was based on another statute wholly removed from any contingency of employing an unauthorized alien. Alabama first relies on *Madeira v. Affordable Housing Foundation, Inc.*, in which the Second Circuit held that § 1324a did not expressly preempt a state workers' compensation law that levied damages against an employer who refused to pay an unauthorized worker who was injured on the job. 469 F.3d 219, 239–40 (2d Cir. 2006). There, the employer's liability was totally unrelated to the work authorization of any employee involved. Alabama also cites to *Jie v. Liang Tai Knitwear Co.* for the proposition that "a statutory reference to sanctions does not equal a reference to damages." 107 Cal. Rptr. 2d 682, 690 n.7 (Cal. Ct. App. 2001). As in *Madeira*, the cause of action in *Jie* was retaliatory termination—an

34

action not in any way based on the work authorization of an employee.[14]  Finally,

Alabama points to an equally inapposite case, *Mendoza v. Zirkle Fruit Co.*, which

held that the plaintiffs had stated a state claim for civil conspiracy based on the

employer's alleged hiring of unauthorized workers in order to depress wages.  No.

00-3024, 2000 WL 33225470, at *11 (E.D. Wash. Sept. 27, 2000), *rev'd on other

grounds*, 301 F.3d 1163 (9th Cir. 2002).  Yet again, the state cause of action was

not dependent on whether the underlying acts involved unauthorized workers.

These cases are all dissimilar from the section 17 cause of action in which liability

is invariably contingent on the hiring and retention of an unauthorized worker.

We are thus persuaded that the Tenth Circuit's reasoning in *Edmondson* is a much

closer analogy than any of the cases cited by Alabama, and we find that section 17

is expressly preempted by § 1324a(h)(2).

       7.     Section 18

Section 18, as amended, imposes a requirement to investigate, through

inquiry under 8 U.S.C. § 1373(c), whether individuals found to be in violation of

Ala. Code § 32-6-1 or § 32-6-9 are permissibly within the United States.  Neither

---

[14] It does not appear that the *Jie* court even seriously considered an express preemption argument as related to § 1324a.  The court's reasoning centered around conflict preemption, *see* 107 Cal. Rptr. 2d at 589 ("[T]here is no conflict between IRCA and the California law that allows employees to sue for wrongful termination . . . ."), and the absence of any provision of IRCA that expressed preemptive intent for federal law to trump "long-standing state law that allows a private cause of action for wrongful termination," *id.* at 690.

the district court nor this court enjoined enforcement of section 18 prior to the

H.B. 658 amendment.  In light of *Arizona*, we find at this time that the United

States is not likely to succeed in its preenforcement challenge to section 18.[15]

We have already determined with respect to section 12(a) that Alabama

officers may inquire into the immigration status of individuals lawfully detained.

This conclusion is consistent with the Supreme Court's rejection of a similar

challenge in *Arizona*.  132 S. Ct. at 2507–10.  Section 18 specifies that an

immigration-status inquiry must be performed for any individual found in

violation of Ala. Code §§ 32-6-1 or 32-6-9—provisions concerning driving

without a valid license—regardless of whether the officer has reasonable suspicion

to believe that the individual is unlawfully present.  *Cf.* Ala. Code § 31-13-12(a)

(requiring reasonable suspicion of unlawful presence in order to engage in the

§ 1373(c) inquiry).  We believe the absence of a reasonable suspicion element is

irrelevant in light of the federal-state communication contemplated by 8 U.S.C.

§ 1373(c), which is not contingent on a state officer's belief of the inquired-about

individual's immigration status.  *See Arizona*, 132 S. Ct. at 2508 ("Congress has

---

[15] The challenge to section 18 is not moot.  The arguments in the district court, and those made prior to the *Arizona* ruling, hinged on whether the state had the authority to mandate this type of immigration inquiry.  The removal of the requirement that an arrestee be taken to a magistrate does nothing to moot the challenge, nor does the clarification of the extent of detention authorized by section 18 "render the original controversy a mere abstraction."  *Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992).

made clear that no formal agreement or special training needs to be in place for state officers to 'communicate with the [Federal Government] regarding the immigration status of *any* individual . . . .'" (emphasis added) (quoting 8 U.S.C. § 1357(g)(10)(A))).

Furthermore, we must give the state an opportunity to clarify the extent to which detentions are permissible under section 18. *See id.* at 2509–10. Although this provision could be construed to allow a detention, we do not rule out the possibility that it could be interpreted differently. The state could, for example, determine that section 18 does not authorize detention or that a detention must be limited in certain ways. In sum, *Arizona* instructs us that a preenforcement challenge to the possibility of detention under section 18 is inappropriate, and we therefore reject the preemption arguments at this time.

### 8.    Section 27

Section 27 prohibits Alabama courts from enforcing or recognizing contracts between a party and an unlawfully present alien, provided the party knew or constructively knew that the alien was in the United States unlawfully. Ala. Code § 31-13-26(a).[16] Certain contracts are permissible, though, and those

---

[16] We agree with the parties that the minor alterations to section 27 effectuated by H.B. 658 do not moot this case. H.B. 658 clarified that the provision did not apply to "a contract entered into prior to [its] effective date" or to "a contract for the appointment or retention of legal

37

exceptions help illustrate Alabama's end goal in enacting section 27: forcing undocumented individuals out of Alabama. A contract is permissible if, for example, it can reasonably be completed within 24 hours of formation. *Id.* Additionally, contracts are permitted to provide for overnight lodging, food, medical services, or transportation "that is intended to facilitate the alien's return to his or her country of origin." *Id.* § 31-13-26(b). In light of these narrow exceptions to section 27, undocumented aliens will be practically prohibited from enforcing contracts for basic necessities.[17] To say that section 27 is extraordinary and unprecedented would be an understatement, as it imposes a statutory disability typically reserved for those who are so incapable as to render their contracts void or voidable. Essentially, the ability to maintain even a minimal existence is no longer an option for unlawfully present aliens in Alabama.

The power to expel aliens has long been recognized as an exclusively federal power. *See Fok Yung Yo v. United States*, 185 U.S. 296, 302, 22 S. Ct. 686, 688 (1902); *Fong Yue Ting v. United States*, 149 U.S. 698, 706–07, 13 S. Ct.

---

counsel in legal matters." H.B. 658, § 1. These changes have neither removed the "challenged features" of the prior law nor altered the fundamental argument of the United States, so we find the controversy is not moot. *Fillyaw*, 958 F.2d at 1520.

[17] Although an unlawfully present alien could technically enter into a contract, the other party could withdraw from it with impunity, taking the proceeds and leaving the alien with no recourse.

1016, 1019 (1893).  The power to exclude and the related federal power to grant

an alien permission to remain "exist as inherently inseparable from the conception

of nationality."  *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304,

318, 57 S. Ct. 216, 220 (1936).  This is so because the federal government "is

entrusted with full and exclusive responsibility for the conduct of affairs with

foreign sovereignties," which includes the field of immigration.  *Hines v.

Davidowitz*, 312 U.S. 52, 62–63, 61 S. Ct. 399, 402 (1941); *see also Arizona*, 132

S. Ct. at 2506–07; *Chy Lung v. Freeman*, 92 U.S. 275, 279–80 (1876).  In light of

these principles, a state's decision to impose "distinct, unusual and extraordinary

burdens and obligations upon aliens" may constitute an impermissible intrusion

into the federal domain.  *Hines*, 312 U.S. at 65–66, 61 S. Ct. at 403.  We believe

that the blanket prohibition of the right to enforce nearly any contract easily

qualifies as an extraordinary burden.

The ability to contract is not merely an act of legislative grace; it is a

capability that, in practical application, is essential for an individual to live and

conduct daily affairs.  The importance of contracts in the United States is

reaffirmed by the Constitution, federal statute, and the Supreme Court.  *See* U.S.

Const. art. I, § 10, cl. 1; 42 U.S.C. § 1981(a); *Jones v. Alfred H. Mayer Co.*, 392

U.S. 409, 432, 88 S. Ct. 2186, 2199 (1968) (recognizing the right "to make

39

contracts" as one of the "great fundamental rights").  Consistent with this general recognition, the Alabama legislature and courts have crafted limitations on the essential right to contract only in circumstances where the contracting individual is presumptively incapable of conducting their own affairs.[18]  *See, e.g.*, *S.B. v. St. James Sch.*, 959 So. 2d 72, 96 (Ala. 2006) (explaining that minors under the age of nineteen are generally incapable of contracting under Alabama law); *Lloyd v. Jordan*, 544 So. 2d 957, 959 (Ala. 1989) (discussing the lack of contractual capacity of the mentally ill); *Williamson v. Matthews*, 379 So. 2d 1245, 1247–48 (Ala. 1980) (explaining that an individual's intoxication renders a contract voidable); *see also* Ala. Code § 26-1-1 (defining the age of majority under state law); *id.* § 26-13-1 *et seq.* (prescribing procedures to relieve minors from the disabilities of nonage).

As previously stated, section 27 excepts from its scope contracts for (1) "lodging for one night," (2) food, (3) medical services, and (4) transportation intended to "facilitate the alien's return to his or her country of origin."  Ala. Code § 31-13-26(b).  Considering this provision, which imposes "distinct, unusual and

---

[18] *See also* Restatement 2d of Contracts § 13 cmt. a (justifying the lack of contractual capacity of persons under guardianship); *id.* § 15 cmt. a (offering the rationale that a person suffering mental disease incurs voidable contractual duties based on "protection of persons unable to protect themselves").

extraordinary burdens," *Hines*, 312 U.S. at 65, 61 S. Ct. at 403, in conjunction

with the sections that require maximum and mandatory enforcement, *see* Ala.

Code §§ 31-13-5, -6, we are convinced that Alabama has crafted a calculated

policy of expulsion, seeking to make the lives of unlawfully present aliens so

difficult as to force them to retreat from the state. *See also* Ala. Code § 31-13-23

(requiring a periodic report on "the progress being made in the effort to reduce the

number of illegal aliens in the State of Alabama"). Because this power is retained

only by the federal government, section 27 is preempted by the inherent power of

the federal government to regulate immigration. *See De Canas*, 424 U.S. at 354,

96 S. Ct. at 936 ("Power to regulate immigration is unquestionably *exclusively* a

federal power." (emphasis added)).[19]

It is also clear to us that the expulsion power Alabama seeks to exercise

through section 27 conflicts with Congress's comprehensive statutory framework

governing alien removal. Congress has specified the numerous categories of

aliens who are subject to removal, 8 U.S.C. § 1227, and identified the particular

classes subject to expedited proceedings, *id.* § 1228. Congress further provided

---

[19] Our conclusion is fully consistent with *De Canas*, where the Supreme Court ruled that a California employment statute was not an unconstitutional regulation of immigration. 424 U.S. at 355–56, 96 S. Ct. at 936. As stated above, section 27 has much more than a "purely speculative and indirect impact on immigration" and, therefore, is not comparable to the statute at issue in *De Canas*. *Id.* at 355, 96 S. Ct. at 936.

that the determination of removability typically must be made by an immigration judge consistent with the procedures set forth in the INA. *Id.* § 1229a(a)–(b). Various statutes govern the relief available to aliens otherwise subject to removal—that is, those aliens who are in the country unlawfully but permitted to remain, whether permanently or temporarily. *See, e.g.*, 8 U.S.C. § 1158 (governing an alien's application for asylum); *id.* § 1229b (regulating cancellation of removal and adjustment of the alien's unlawful status); *id.* § 1229c (prescribing the conditions of voluntary departure); *id.* § 1231(b)(3) (governing withholding of removal); *see also* 8 C.F.R. § 208.16(c) (controlling claims under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment). By enacting section 27, Alabama has essentially decided that unlawfully present aliens cannot be tolerated within its territory, without regard for any of the statutory processes or avenues for granting an alien permission to remain lawfully within the country.

It is also obvious from the statutory scheme that Congress intends the Executive Branch to retain discretion over expulsion decisions and applications for relief.[20] *See Holder v. Martinez Gutierrez*, 566 U.S. ___, 132 S. Ct. 2011,

---

[20] Control over the expulsion of aliens has long been recognized as "a power affecting international relations," *Fong Yue Ting*, 149 U.S. at 713, 13 S. Ct. at 1022, thus bringing it within the province of the Executive, *see Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414, 123 S.

2015 (2012) ("The immigration laws have long given the Attorney General discretion to permit certain otherwise-removable aliens to remain in the United States."). This discretion is perhaps best illustrated by Congress's decision to vest exclusive power in the Attorney General to "commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–85, 119 S. Ct. 936, 943–44 (1999) (discussing the administrative discretion codified in § 1252(g)). Similarly, Congress contemplated that officers of the Executive Branch would exercise their judgment on the subject of granting temporary or permanent relief from removal. *See* 8 U.S.C. § 1158(b)(1)(A) (permitting the Attorney General or Secretary of Homeland Security to grant asylum); *id.* § 1229b(a), (b) (permitting the Attorney General to cancel removal proceedings and to adjust an alien's immigration status); *id.* § 1229c(a), (b) (authorizing the Attorney General to permit an alien's voluntary departure); *id.* § 1231(b)(3) (prohibiting removal if the Attorney General determines the alien's life or freedom would be threatened on any of the specified grounds). And along with this discretion, Congress sharply

Ct. 2374, 2386 (2003). *See also Arizona*, 132 S. Ct. at 2498; *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S. Ct. 512, 519 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations . . . .").

43

limited judicial review of the immigration-related adjudications. *See id.*

§ 1252(a)(2), (b)(4). These statutes point to one conclusion: Congress intended

that the Executive Branch determine who must be removed and who may

permissibly remain. Through section 27, Alabama has taken it upon itself to

unilaterally determine that any alien unlawfully present in the United States cannot

live within the state's territory, regardless of whether the Executive Branch would

exercise its discretion to permit the alien's presence. This is not a decision for

Alabama to make,[21] and we find that section 27 conflicts with federal law.

Alabama argues that section 27 is shielded from preemption because it

legislates in the field of contract law, which is typically within the province of the

states and therefore entitled to the presumption against preemption. While it is

true that contract is a matter of traditional state concern, that does not resolve the

preemption inquiry. Indeed, the Supreme Court's decision in *Crosby v. National

Foreign Trade Council* refutes Alabama's position. 530 U.S. 363, 120 S. Ct. 2288

(2000). In *Crosby*, Massachusetts enacted a law to restrict the ability of state

agencies to buy goods and services from companies that conducted business with

Burma. *Id.* at 367, 120 S. Ct. at 2291. Congress, however, enacted a statute

---

[21] If every other state enacted similar legislation to overburden the lives of aliens, the immigration scheme would be turned on its head. The federal government—not the fifty states working in concert—retains the power to exclude aliens from the country.

44

imposing mandatory and conditional sanctions on Burma just three months after the Massachusetts law was enacted. *Id.* at 368, 120 S. Ct. at 2291. The intended result of the state statute—like its federal counterpart—was economic pressure on the Burmese government, and the state sought to achieve its goal through the state's own purchasing power. The Court concluded that, even if a presumption against preemption applied, the Massachusetts statute regulating the state's own business transactions would not escape preemption. *Id.* at 374 n.8, 120 S. Ct. at 2294. Similar to the situation at hand, Congress had promulgated federal law to ensure that the Executive had "flexible and effective authority" over the economic sanctions, which contributed to the finding of preemption. *See id.* at 374, 120 S. Ct. at 2295.

The Supreme Court has also instructed that a preemption analysis must contemplate the practical result of the state law, not just the means that a state utilizes to accomplish the goal. In *Buckman Co. v. Plaintiffs' Legal Committee*, the Supreme Court found that a state tort cause of action—an area of traditional state concern—was preempted by federal law where the underlying allegations concerned fraud against a federal agency. 531 U.S. 341, 347, 121 S. Ct. 1012, 1017 (2001) ("Policing fraud against federal agencies is hardly 'a field which the States have traditionally occupied' . . . ." (quoting *Rice v. Santa Fe Elevator*

45

*Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152 (1947))). The concern was stated more explicitly in *Wisconsin Department of Industry, Labor & Human Relations v. Gould, Inc.*, where the Court considered a state statute that regulated the state's own purchase of goods and services. 475 U.S. 282, 283–84, 106 S. Ct. 1057, 1059–60 (1986). "[T]he point of the [state] statute," the Court explained, was "to deter labor law violations." *Id.* at 287, 106 S. Ct. 1061–62; *see also id.* (observing that "[n]o other purpose could credibly be ascribed" to the state law). Thus, even though the state purported to govern in an area of traditional state concern, it could not "enforce the requirements" of federal regulations through its own statutory scheme. *Id.* at 291, 106 S. Ct. at 1064. Stated another way, "[t]he fact that the State 'had chosen to use its spending power rather than its police power'" did not remedy the conflict between the federal and state statutes. *Crosby*, 530 U.S. at 373 n.7, 120 S. Ct. at 2294 (quoting *Gould*, 475 U.S. at 289, 106 S. Ct. at 1062).

Like the state statutes in *Crosby*, *Buckman*, and *Gould*, the thrust of section 27 is to impinge on an area of core federal concern. It constitutes a thinly veiled attempt to regulate immigration under the guise of contract law, and thus, we do not think the presumption against preemption applies. *See Buckman*, 531 U.S. at 347–48, 121 S. Ct. at 1017. Even if it does, we conclude that it is preempted. *See*

46

*Crosby*, 530 U.S. at 374 n.8, 120 S. Ct. at 2294.[22]

>    9.    Section 28

Section 28 requires Alabama's public elementary and secondary schools to request certain documentation from enrolling children in order to classify them as either lawfully or unlawfully present within the United States. Ala. Code § 31-13-27(a). The United States contends, as it did in the district court, that section 28 is preempted by 8 U.S.C. § 1643(a)(2), which provides that no federal law "may be construed as addressing alien eligibility for a basic public education as determined by the Supreme Court of the United States under *Plyler v. Doe*." The district court did not preliminarily enjoin section 28, but this court did enjoin its enforcement pending appeal.

We have found in the private plaintiffs' companion case, No. 11-14535, that section 28 violates the Equal Protection Clause as interpreted in *Plyler*. Thus, it is unnecessary to address the United States's argument that it is also preempted by federal law, though we recognize that the statutory reference to *Plyler* means that the inquiries necessarily overlap. Because we reverse the district court's disposition of this claim in the private plaintiffs' case, we dismiss the United

---

[22] Alabama suggests in its supplemental brief that section 27 could be saved by severing the "constructive knowledge" element of the provision. We do not think that the purpose or the effect of the statute would be materially altered by that.

47

States's appeal as moot.

> 10.    Section 30

As originally enacted, section 30 provided that an unlawfully present alien "shall not enter into or attempt to enter into a business transaction with the state or a political subdivision" thereof. Alabama contended that this language covered only transactions to obtain licenses, and the district court adopted that reading of the law in making its decision. *See United States v. Alabama*, 813 F. Supp. 2d at 1350–51. Since oral argument in this appeal, the Alabama legislature amended section 30 to clarify that it is a criminal act for an unlawfully present alien to enter into certain "public records transaction[s]." H.B. 658, § 1.[23] This phrase is defined as applying for or renewing "a motor vehicle license plate," "a driver's license or nondriver identification card," "a business license," "a commercial license," or "a professional license." *Id.* Section 30, as amended, clarifies that it does not reach applications for a marriage license, transactions related to housing or property ownership, payment of property or other taxes, or "any other transaction." *Id.* Thus, by the terms of the newly enacted section 30, the state legislature has clarified that the criminal prohibitions apply only to six select

---

[23] It is also unlawful for any individual to enter or attempt to enter into any of these transactions on behalf of an unlawfully present alien. Ala. Code § 31-13-29(b).

categories of state-issued licenses: vehicle license plates, driver's licenses, identification cards, business licenses, commercial licenses, and professional licenses. An individual who engages in the proscribed behavior commits a Class C felony, Ala. Code § 31-13-29(d), which is punishable by a term of imprisonment of between one and ten years, *id.* § 13A-5-6(a)(3), and a possible additional fine of up to $15,000, *see id.* § 13A-5-11(a)(3); *see also id.* § 13A-5-2(a)–(b).[24]

First, we dismiss any argument that the particular licensing restrictions housed in subsection (a) are facially preempted by federal law. Through the REAL ID Act of 2005, Pub. L. No. 109-13, § 202(c)(2)(B), 119 Stat. 231, 313 (codified as note to 49 U.S.C. § 30301), Congress encouraged individual states to require evidence of lawful status as a prerequisite to issuing a driver's license or identification card to an applicant. Given that the states may thus permissibly withhold these instruments from unlawfully present aliens, it follows that it is perfectly legitimate for Alabama to withhold a motor vehicle license plate from an

---

[24] We conclude that the challenge to section 30 is not moot. Section 30(d), the subsection that imposes criminal penalties, has been amended only to clarify that it applies to unlawfully present aliens or those who act on their behalf, as stated in subsection (b). We understand this criminalization to be the main thrust of the United States's challenge, and H.B. 658 has not removed this "objectionable feature[] of the prior law." *Fillyaw*, 958 F.2d at 1520. Moreover, H.B. 658 aligned the text of section 30(a) with the interpretation that Alabama adopted in briefing and that the district court applied in its ruling. Because the United States consistently argued that the former section 30 was preempted even if limited to business transactions, the controversy here remains live.

individual who cannot lawfully operate the vehicle.

The withholding of business, commercial, and professional licenses is likewise permissible. Pursuant to Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("Welfare Reform Act"), Pub. L. No. 104-193, 110 Stat. 2105, Congress deemed some unlawfully present aliens ineligible for certain state and local public benefits unless the state explicitly provides otherwise. *See* 8 U.S.C. § 1621. The benefits for which such aliens are ineligible include any "professional license[] or commercial license provided by an agency of a State or local government or by appropriated funds of a State or local government." *Id.* § 1621(c)(1)(A). Congress's definition of the relevant benefits appears to us entirely consistent with the licenses that Alabama withholds through section 30. As Congress has either expressly or implicitly approved of the state's withholding of a license in each of the six categories within the purview of section 30, the state's restriction is not facially preempted.

The United States observes that there may be an incongruence between the two federal statutes and Alabama's licensing restrictions, insofar as the latter may be applied to certain aliens who may in fact be eligible for the licenses under federal law. This argument has some force. Indeed, the key phrase in section 30(b)—"alien not lawfully present in the United States"—could be construed in a

50

way that it would be in tension with the REAL ID Act, *see, e.g.*, Pub. L. No. 109-13, § 202(c)(2)(B)(vi), 119 Stat. at 313 (contemplating that an alien who "has a pending application for asylum" can obtain a driver's license), and the Welfare Reform Act, *see, e.g.*, 8 U.S.C. §§ 1621, 1641(b)(5) (providing that "an alien whose deportation is being withheld" is a "qualified alien" eligible for state benefits). But section 30 could be construed to avoid this problem, and if this issue does arise, it may be more appropriately addressed in the context of an as-applied challenge.

The question then is whether section 30 can be upheld insofar as subsection (d) creates a new state felony for application or attempted application for the requested licenses. The United States emphasizes the complete absence of federal criminal penalties attached to licensing applications. The United States posits that the felony criminal penalty associated with attempts to apply for state licenses are inconsistent with the federal scheme because the only result contemplated under federal law is denial of the requested license.[25] Although there is some pull to this

---

[25] The United States also suggests that section 30, both as originally enacted and as amended, effectively criminalizes "an alien's unlawful presence in Alabama." Supplemental Brief of the United States at 13. We have difficulty seeing this to be the case. We agree with the United States that section 30, as originally enacted, had the purpose and effect of driving unlawfully present aliens out of the state. It criminalized any attempt by such aliens to enter into "*any* transaction between a person and the state or a political subdivision," with the exception of applications for marriage licenses. Ala. Code § 31-13-29(a) (emphasis added), *amended by* H.B. 658, § 1. Thus, it clearly contemplated that these aliens would be deprived of basic needs, such

51

argument, at this point we do not find it entirely persuasive.

The United States identifies the REAL ID Act and the Welfare Reform Act as the sources of federal preemption.  But our examination of these statutes does not leave us with the impression that subsection (d) would be inconsistent with federal objectives.  As relevant here, the REAL ID Act provides that the federal government will not accept a state-issued driver's license or identification card unless the state verified the citizenship or immigration status of the applicant before issuing the document.  *See* Pub. L. No. 109-13, § 202(c)(2)(B), 119 Stat. at 313.  Notably, this measure does not prohibit states from issuing driver's licenses or identification cards to unlawfully present aliens.  Nor does it even require that states verify the citizenship or immigration status of those who apply for such documents.  Rather, it provides an incentive—albeit a strong one—for states to institute such a verification scheme.

The REAL ID Act thus does not purport to comprehensively regulate

---

as water, garbage, and sewer services.  It thus amounted to an impermissible policy of expulsion.

As amended, however, section 30 criminalizes only the attempt to obtain vehicle license plates and various licenses.  The scope of section 30, as amended, is thus considerably smaller, and we do not think that it has the effect of making it impossible for unlawfully present aliens to live in Alabama or otherwise criminalizing their presence.  This is especially so because the state may withhold these benefits, consistent with the REAL ID Act and the Welfare Reform Act.  Section 30 only operates to proscribe conduct in which unlawfully present aliens are unlikely to engage, given that, through H.B. 56 and prior legislation, Alabama has chosen not to make them eligible for these specific benefits in the first place.  *See also* Ala. Admin. Code r. 760-X-1-.20 (requiring driver's license applicants to submit proof of authorized presence).

52

driver's licenses, identification cards, and unlawfully present aliens. Rather, it leaves the field essentially open, giving room for the states to adopt different policies concerning this subject. *See* H.R. Rep. No. 109-72, at 177 (2005) (Conf. Rep.), *reprinted in* 2005 U.S.C.C.A.N. 240, 302 (noting that the REAL ID Act "does not directly impose federal standards" and that "states need not comply with the listed standards"). Given the limited scope of the REAL ID Act, we do not see how it forecloses Alabama's decision to make it a crime for an unlawfully present alien to attempt to get a driver's license or identification card once it has decided that such aliens are ineligible for these documents.

The idea that the Welfare Reform Act preempts section 30(d), insofar as it concerns business, commercial, and professional licenses, rests on more solid ground. That legislation sought to establish a "national policy with respect to welfare and immigration," one that Congress enacted in an attempt to "remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601. Thus, the Welfare Reform Act is similar to IRCA in that it represents a concerted effort on the part of Congress to address the flow of illegal immigration across the nation's borders. *See Patel v. Quality Inn South*, 846 F.2d 700, 704 (11th Cir. 1988) ("Congress enacted the IRCA to reduce illegal immigration by eliminating employers' economic incentive to hire undocumented

53

aliens.").

But the Welfare Reform Act is different from IRCA in a crucial respect. IRCA is a "comprehensive scheme," *Hoffman Plastic Compounds*, 535 U.S. at 147, 122 S. Ct. at 1282, that embodies a "careful balance struck by Congress," *Arizona*, 132 S. Ct. at 2505. Specifically, IRCA's lengthy legislative history shows "that Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment." *Id.* at 2504. The legislative record reflects "a considered judgment that [such penalties] would be inconsistent with federal policy and objectives." *Id.* For this reason, even though the text of IRCA itself does not prohibit states from imposing sanctions on unauthorized aliens who engage in work, the individual states are not free to do so. *See id.* at 2504–05.

The same conclusion does not seem to obtain under the Welfare Reform Act. It is true that the statute is singularly focused on the withholding of licenses, and it does not provide for criminal sanctions. *See* 8 U.S.C. § 1621.[26] But the

---

[26] The Welfare Reform Act also seems to be of a different character than IRCA in that it does not purport to offer a definitive approach to the problem that Congress perceived. Indeed, although Congress made the determination that unlawfully present aliens generally should not be eligible for licenses, *see* 8 U.S.C. § 1621(a), it also contemplated that states could opt out of that rule, *see id.* § 1621(d); *see also id.* § 1601(7) (recognizing that states can choose not to "follow the Federal classification"). Thus, far from occupying the field, Congress accepted that states would adopt different policies on licenses and unlawfully present aliens.

statute also does not expressly rule out such penalties, and the United States has not cited any legislative history, similar to that of IRCA, that would reflect "a considered judgment" on the part of Congress "that [such penalties] would be inconsistent with federal policy and objectives." *Arizona*, 132 S. Ct. at 2504. In the absence of such a showing, it is not evident that a measure like subsection (d) would detract from Congress's policy objectives and thus be impliedly preempted.

Of course, this is not to say that subsection (d) is, without a doubt, in harmony with the existing congressional design. Alabama has decided to make an attempt to seek a license an offense that is punishable by up to ten years imprisonment, *see* Ala. Code § 13A-5-6(a)(3), and a possible additional fine of up to $15,000, *see id.* § 13A-5-11(a)(3); *see also id.* § 13A-5-2(a)–(b).[27] Congress may very well have thought that this kind of penalty is inappropriate. *Cf.* H.R. Rep. No. 99-682, pt. I, at 46 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5650 (discussing in the context of IRCA that employer, rather than employee, sanctions are "the most humane, credible and effective way" of responding to the influx of undocumented aliens). But the United States has not drawn our attention to any legislative history to demonstrate this. As a result, for now, there is only "a

---

[27] We observe again that section 30 only criminalizes conduct that appears highly unlikely to occur, given that Alabama has chosen not to make these specific benefits available in the first place.

55

hypothetical or potential conflict," which is insufficient to establish preemption. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 102 S. Ct. 3294, 3299 (1982).

In sum, we conclude that the restrictions on licenses, as clarified by recent amendment, are not facially in tension with the federal immigration scheme. We also hold that at this stage, the United States has not shown that the criminal provisions located in section 30(d) are preempted by federal law.

B.    Equitable Factors

The equities weigh in favor of enjoining those provisions that are preempted by federal law. The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations. Frustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation. For these reasons, and the numerous reasons detailed above that require federal law to prevail, the equities favor enjoining enforcement of sections 10, 11(a), 13(a), 16, 17 and 27.

## III.  Conclusion

Just like Arizona, Alabama has "understandable frustrations with the problems caused by illegal immigration." *Arizona*, 132 S. Ct. at 2510. Although it is a problem that gives rise to unique issues in our Nation, we must be mindful that individual states "may not pursue policies that undermine federal law." *Id.*

56

We find that the United States is likely to succeed on the merits of its challenge to sections 10, 11(a), 13(a), 16, 17, and 27.  Consistent with its position set forth in supplemental briefing, we agree with the United States that it is not likely to succeed on the merits of its challenge to section 12(a) or section 18 at this time. We also find that the United States has not shown at this stage that it is likely to succeed on the merits of its challenge to section 30.  Finally, we dismiss the United States's appeal as to section 28 as moot, as our opinion in the private plaintiffs' companion case fully disposes of that issue.[28]

**AFFIRMED IN PART, REVERSED IN PART, DISMISSED IN PART, AND REMANDED.**

---

[28] In light of our disposition, Alabama's motion to partially vacate the injunction is granted.  A separate order shall issue.