[No. B135141. Second Dist., Div. Three. May 30, 2001.]

LUO YU JIE et al., Plaintiffs and Respondents, v.
LIANG TAI KNITWEAR CO., LTD., et al., Defendants and Appellants.

### COUNSEL

Roxborough, Pomerance, Gallegos & Nye, Gary A. Nye and Esteban G. Gallegos for Defendants and Appellants.

Law Offices of Charles T. Mathews and Stephen R. Diamond for Plaintiffs and Respondents.

### OPINION

**CROSKEY, Acting P. J.**—Liang Tai Knitwear Co., Ltd. (Manufacturer) and Hong Yuan Industrial Co., Ltd. (Marketer) (collectively defendants) are in the garment business here in Los Angeles. Lou Yu Jie (Wife) and Fu E. Min (Husband) (collectively plaintiffs) both worked for defendants in the garment business. After defendants laid off plaintiffs, plaintiffs sued, alleging their terminations were retaliatory in nature: plaintiffs had reported defendants to the Immigration and Naturalization Service (INS), and the INS had raided defendants' business and arrested approximately 40 percent of defendants' labor force as undocumented, and hence illegal, workers. The jury found in favor of plaintiffs, and defendants now appeal. We affirm.

#### FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiffs had immigrated to the United States from China in 1992. They were not familiar with immigration laws, and worked illegally themselves until they learned about the immigration and work permit process. They then obtained the necessary work permits. Before this happened, defendants had obtained work documents for plaintiffs, which plaintiffs subsequently discovered were not legal.

While working for defendants, plaintiffs became aware that defendants were employing other undocumented workers. Husband complained about this and, during an argument with a supervisor, threatened to report defendants to the INS. In fact, Husband, who speaks no English, had his 15-year-old daughter, who does speak English, call the INS in March 1997 and report

---

[1]These facts come from the appellant's appendix in lieu of clerk's transcript and the reporter's transcript. When there are conflicting facts, we recite those which support the jury's verdict, in other words, those which the jury found most credible.

defendants. In May 1997, there was an INS raid during which 36 undocumented workers (40 percent of the total work force) were arrested. There was no dispute at trial that this happened.

Less than three months later, in August 1997, defendants laid off plaintiffs because of an alleged "slowdown" in business. Husband and Wife, however, were the *only* employees "laid off," and, in fact, defendants continued to hire more employees. Plaintiffs sued for breach of contract, breach of the covenant of good faith and fair dealing, and wrongful termination in violation of public policy, specifically, the policy against retaliating against one who reports a violation of state and/or federal laws against employing illegal aliens.

The evidence that plaintiffs were fired in retaliation for reporting their employers' illegal activities was enough to convince the jury. The jury returned a special verdict. The verdict awarded Husband $88,000 against Manufacturer and $88,500 against Marketer as compensatory damages; Wife was awarded $110,500 against Manufacturer and $110,500 against Marketer in compensatory damages. The jury also awarded plaintiffs, jointly, $23,200 against Manufacturer and $56,800 against Marketer in punitive damages.

## CONTENTIONS ON APPEAL

Defendants contend that (1) the plaintiffs' claims for violation of public policy are preempted by federal law, specifically the Immigration Reform and Control Act of 1986 (IRCA) (Pub.L. No. 99-603 (Nov. 6, 1986) 100 Stat. 3359), effective July 1, 1987; (2) even if a private right of action exists, the plaintiffs were required to, and failed to, exhaust the administrative remedies provided by IRCA; (3) the judgment against Marketer must be reversed, because there was no evidence that an employee/employer relationship existed between plaintiffs and Marketer; (4) the damage award must be reversed, because it exceeds the damages allowed by IRCA; (5) jury misconduct requires reversal; and (6) the evidence is insufficient to justify the verdict.[2] Plaintiffs dispute these contentions.

## DISCUSSION

1. *Plaintiffs' Claims for Wrongful Termination in Violation of Public Policy Are Not Preempted by IRCA*

 Defendants contend that California law, to the extent it allows an action for wrongful termination in violation of public policy to be based on

---

[2]Defendants also point out that, in their opinion, the trial court "improperly instructed the jury." They also point out that this "may" form the basis for granting a new trial. However, they fail to make the necessary connection between any alleged error, prejudice to them, and how such facts require reversal. We therefore shall not address this particular argument.

retaliation for reporting a violation of the federal Immigration and Naturalization Act (INA) (codified commencing at 8 U.S.C. § 1101), as amended by IRCA,[3] is preempted by IRCA. They further contend that IRCA provides no private right of action such as the one plaintiffs brought here for wrongful termination in violation of public policy. Therefore, defendants claim, the judgment in favor of plaintiffs must be reversed. We disagree.

### a. *Introduction to IRCA*

IRCA is "[a]n Act to amend the Immigration and Nationality Act [INA] to revise and reform the immigration laws, and for other purposes." (Prefatory heading to Pub.L. No. 99-603; see INA, § 1(b).) The INA's (8 U.S.C. § 1101 et seq.) " 'central concern . . . is with the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.' [Citation.]" (*Sure-Tan, Inc. v. NLRB* (1984) 467 U.S. 883, 892, [104 S.Ct. 2803, 2809, 81 L.Ed.2d 732] (*Sure-Tan*), quoting *De Canas v. Bica* (1976) 424 U.S. 351, 359 [96 S.Ct. 933, 938, 47 L.Ed.2d 43].) As the *Sure-Tan* court noted, "A primary purpose in restricting immigration is to preserve jobs for American workers; immigrant aliens are therefore admitted to work in this country only if they 'will not adversely affect the wages and working conditions of the workers in the United States similarly employed.' [Citations.]" (*Sure-Tan, supra,* 467 U.S. at p. 893 [104 S.Ct. at p. 2809].)

As is apparent from its terms, IRCA, among other things, amended the INA to give additional protection to aliens *lawfully* in the country by making it illegal, except in some circumstances, for employers to discriminate against such lawful aliens simply because of their national origin or citizenship status. However, of particular relevance here, IRCA also put additional teeth into INA's protection of the jobs of existing, lawful and *documented* workers by criminalizing certain employer practices that allow *undocumented* aliens to obtain work in the United States.[4]

Thus, the INA now provides for criminal and civil sanctions against an employer who knowingly hires or recruits for employment an illegal alien. (8 U.S.C. § 1324a(f)(1).) Furthermore, the statute makes it illegal for an employer to continue to employ the alien in the United States knowing the

---

[3]We will refer to the INA as amended by IRCA as simply IRCA for purposes of this opinion.

[4]Before IRCA, INA did not make it unlawful for an employer to hire an alien who was present or working in the United States without appropriate authorization, but only to "concea[l], harbo[r], or shiel[d] from detection" any alien not lawfully entitled to enter or reside in the United States. (*Sure-Tan, supra,* 467 U.S. at p. 893 [104 S.Ct. at p. 2809]; see former 8 U.S.C. § 1324(a) ["employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring"].)

alien is or has become an unauthorized alien with respect to such employment. Employers now may not circumvent the provisions of the statute by contracting with illegal aliens as so-called independent contractors (8 U.S.C. § 1324a(a)(4)), and they now have an affirmative duty to verify the employment eligibility of all applicants by checking certain documents. (8 U.S.C. § 1324a(b).)

The public policies behind IRCA are twofold: (1) to protect documented workers from employment discrimination based on national origin and citizenship status, and (2) to protect all documented workers, whether citizens or not, from competition by undocumented workers who, by accepting substandard terms as to wages and working conditions, can seriously depress wage scales and working conditions of citizens and legally admitted aliens, thus diminishing the effectiveness of labor unions. (*De Canas v. Bica, supra,* 424 U.S. at p. 359 [96 S.Ct. at p. 938].)[5] Thus, an employer who is employing undocumented workers clearly is violating both state and federal law.

■ The question here is whether discharging an employee who complains about such employment of undocumented workers is wrongful or not. Normally, an employer can fire at-will employees with impunity so long as the terminations are not motivated by legally proscribed, invidious discriminatory attitudes, such as animus toward a particular race or gender (the at-will employment doctrine). However, the California Supreme Court, in *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330] (*Tameny*) recognized, as an additional exception to the at-will employment doctrine, the so-called public policy exception. Under this exception, an at-will employee possesses a tort action when he or she is discharged for performing an act that public policy would encourage, or for refusing to do something that public policy would condemn. (*Gantt v. Sentry*

---

[5]Before the INA was amended to criminalize an employer's employment of undocumented workers, California had its own statutory scheme making the employer liable for employing undocumented workers. This scheme was challenged on the ground it was preempted by the INA; the United States Supreme Court held it was not preempted.

In *De Canas v. Bica, supra,* 424 U.S. 351, 359 [96 S.Ct. 933, 938], the Supreme Court found that the California statute, which prohibited an employer from knowingly employing an alien not entitled to lawful residence in the United States, was not preempted by the INA.

The *De Canas* court recognized that California's law protected the state's interests: protecting the jobs of citizens and legally admitted aliens in times of high unemployment; avoiding the depression of wage scales and working conditions of citizens and legally admitted aliens; and protecting the effectiveness of labor unions. It also recognized that these local problems are particularly acute in California in light of the significant influx into the state of illegal aliens from neighboring Mexico. Notably, the court also commented that the INA had the same purpose as the California law, and thus there was no conflict between the state and the federal laws.

*Insurance* (1992) 1 Cal.4th 1083, 1095-1097 [4 Cal.Rptr.2d 874, 824 P.2d 680] (*Gantt*), overruled on another ground, *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 79, fn. 6 [78 Cal.Rptr.2d 16, 960 P.2d 1046].) Since *Tameny*, the California Supreme Court has since reaffirmed its commitment to the public policy exception on several occasions. (See, e.g., *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 665-671 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*); *Shoemaker v. Myers* (1990) 52 Cal.3d 123 [276 Cal.Rptr. 303, 801 P.2d 1054]; *Rojo v. Kliger* (1990) 52 Cal.3d 65, 88-89 [276 Cal.Rptr. 130, 801 P.2d 373]).

Despite its broad acceptance, the principle underlying the public policy exception is more easily stated than applied. (*Gantt, supra,* 1 Cal.4th at p. 1090.) The difficulty, of course, lies in determining where and how to draw the line between claims that genuinely involve matters of public policy, and those that concern merely ordinary disputes between employer and employee. (*Ibid.*) This determination depends in large part on whether the public policy alleged is sufficiently clear to provide the basis for such a potent remedy. (*Ibid.*) One basic guideline is that the policy in question must involve a matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer. (*Ibid.*) In addition, the policy must be "fundamental," "substantial" and "well established" at the time of the discharge. (*Ibid.*; *Foley, supra,* 47 Cal.3d at pp. 669-670.) Those criteria are clearly satisfied here.[6]

Although the violation of a statute or constitutional provision is not invariably a *prerequisite* to the conclusion that a discharge violates public policy (*Green v. Ralee Engineering Co., supra,* 19 Cal.4th at p. 79, and fn. 6), the existence of a statute on a particular topic is one excellent method of establishing a public policy as to that subject. (*Gantt, supra,* 1 Cal.4th at pp. 1091-1092.) And thus, a violation of the statute is *also* a violation of public policy, and if an employer fires an employee who complains to the authorities about such violation, then the termination is a termination in violation of

[6]For example, a law represents a fundamental public policy when the conduct it proscribes is punishable as a crime. (See *Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1148-1149 [37 Cal.Rptr.2d 718].) Here, IRCA criminalizes the pattern and practice of employing undocumented workers. (8 U.S.C. § 1324a(f)(1) ["Any person or entity which engages in a pattern or practice of violations of subsection (a)(1)(A) or (a)(2) of this section shall be fined not more than \$3,000 for each unauthorized alien with respect to whom such a violation occurs, imprisoned for not more than six months for the entire pattern or practice, or both, notwithstanding the provisions of any other Federal law relating to fine levels"].) In addition, laws intended to protect workers have generally been found to reflect fundamental public policies. (See, e.g., *Hentzel v. Singer Co.* (1982) 138 Cal.App.3d 290, 298 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015] [firing a worker for making complaints about smoking in the workplace violates fundamental public policy]; *Phillips v. Gemini Moving Specialists* (1998) 63 Cal.App.4th 563, 574 [74 Cal.Rptr.2d 29] [firing a worker for complaining about illegal withholding of pay violates fundamental public policy].)

public policy. And such termination, being in contravention of a fundamental public policy, is hence actionable as the tort of wrongful termination in violation of public policy. (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252 [32 Cal.Rptr.2d 223, 876 P.2d 1022], overruled on another ground, *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 498 [59 Cal.Rptr.2d 20, 926 P.2d 1114].)

Here, therefore, assuming the evidence supports the jury's verdict, if defendants fired plaintiffs for complaining to the authorities that defendants were employing undocumented workers in violation of IRCA, such termination would be in violation of a fundamental public policy.

### b. *Preemptive Effect of INA as Amended by IRCA*

A state law is preempted by a federal law only if there is "such actual conflict between the two schemes of regulation that both cannot stand in the same area" (*Florida Avocado Growers v. Paul* (1963) 373 U.S. 132, 141 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (*Florida Avocado Growers*)), or if Congress has in some other way unambiguously declared its intention to foreclose the state law in question. (See *Ray v. Atlantic Richfield Co.* (1978) 435 U.S. 151, 157-158 [98 S.Ct. 988, 994, 55 L.Ed.2d 179].) When there is no apparent conflict between a federal and a state law, a court should not conclude that Congress legislated "the ouster of [a state law] in the absence of an unambiguous congressional mandate to that effect." (*Florida Avocado Growers, supra*, 373 U.S. at pp. 146- 147 [83 S.Ct. at p. 1219].)

Here, there is no conflict between IRCA and the California law that allows employees to sue for wrongful termination if they allege they were fired because they reported their employer for violating federal or state laws against employing undocumented workers. Allowing such suits does not interfere with the policies behind IRCA. If anything, such actions help to enforce IRCA by providing some form of redress for persons willing to risk their jobs by reporting illegal activity. In fact, those persons in the best position to report IRCA violations—other employees—are the only persons in need of such a remedy for wrongful employer retaliation. Thus, there is no "actual conflict between the two schemes of regulation [such] that both cannot stand in the same area." (*Florida Avocado Growers, supra*, 373 U.S. at p. 141 [83 S.Ct. at p. 1217].) And such employee reporting of violations to the INS, encouraged by the availability of redress for retaliation, serves as a form of enforcement; if state enforcement activities do not impair federal regulatory interests, then concurrent enforcement activity is authorized. (*Ibid.*)

The question then becomes whether Congress has in some other way unambiguously declared its intention to foreclose the state law in question.

(See *Ray v. Atlantic Richfield Co., supra*, 435 U.S. at pp. 157-158 [98 S.Ct. at p. 994].) No such intent is apparent in IRCA; in fact, just the opposite appears from the provisions of the act.

We first note that IRCA *explicitly* provides for preemption of state laws in certain situations. For example, title 8 United States Code section 1324a(h)(2), Preemption, states that "The provisions of this section preempt any State or local law imposing civil or criminal *sanctions* (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." (Italics added.)[7] And title 8 United States Code section 1188, related to temporary agricultural workers, provides, at subdivision (h)(2), "The provisions of subsections (a) and (c) of section 1184 of this title and the provisions of this section preempt any State or local law regulating admissibility of nonimmigrant workers."

There is no similar language preempting long-standing state law that allows a private cause of action for wrongful termination in violation of public policy. The omission of a preemption proviso for the IRCA as a whole, when such language has been inserted as to specific aspects of the IRCA, is indicative of a legislative intent that IRCA is not to be read as preempting anything but the laws specifically mentioned. (See *In re Rudy L.* (1994) 29 Cal.App.4th 1007, 1011-1012 [34 Cal.Rptr.2d 864] and cases cited there.) This interpretation is also in keeping with the rule that, in the absence of a conflict or a clear mandate, a court should not presume that Congress intended to oust state law. (*Florida Avocado Growers, supra*, 373 U.S. at pp. 146-147 [83 S.Ct. at p. 1219].)

We therefore conclude that California's law allowing wrongful termination actions for retaliation for reporting violations of IRCA is not preempted by IRCA, and plaintiffs' judgment need not be reversed for this reason.

### 2. *Plaintiffs Were Not Required to Exhaust IRCA's Administrative Remedies*

██ Defendants also contend that even if plaintiffs' cause of action for wrongful termination was not preempted by IRCA, plaintiffs nonetheless were required to exhaust IRCA's administrative remedies. Specifically, they contend plaintiffs were required to give notice to the special counsel provided for under IRCA before bringing their action for wrongful termination. Defendants are wrong. The administrative remedy to which they point was

---

[7]Sanctions are not the same as damages; a statutory reference to sanctions does not equal a reference to damages. (*Faria v. San Jacinto Unified School Dist.* (1996) 50 Cal.App.4th 1939, 1947-1948 [59 Cal.Rptr.2d 72].)

designed to aid documented alien workers who are discriminated against because of their national origin or citizenship status. It is entirely unrelated to employees who are the victims of retaliation because they have reported a violation of the provisions of IRCA that criminalize an employer's employment of undocumented aliens.

Title 8 United States Code section 1324b, *"Unfair* immigration-related *employment practices,"* (italics added) is the section on which defendants rely. This section makes it illegal to discriminate against certain employees. Section 1324b defines as an unfair immigration-related employment practice (with certain exceptions) "discriminat[ion] against any individual (other than an unauthorized alien, as defined in section 1324a(h)(3) of this title) with respect to the hiring, or recruitment or referral for a fee, of the individual for employment or the discharging of the individual from employment" because of his or her national origin, or because of his or her citizenship status. (§ 1324b(a)(1)(A), (a)(1)(B).) It is also an unfair employment practice to "intimidate, threaten, coerce, or retaliate against any individual for the purpose of interfering with any right or privilege secured under this section or because the individual intends to file or has filed a charge or a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section." (§ 1324b(a)(5).)

This section, after making it illegal to discriminate against individual employees or potential employees, provides the victims of such wrongful discrimination with (1) an administrative remedy (a claim filed with a special counsel), and (2) a private right of action after such administrative remedies have been exhausted. (§ 1324b(b)(1), (d)(2).) Thus, if one is discriminated against in employment because of one's national origin or citizenship status, or if one is retaliated against for complaining about such discrimination, then one has a private right of action after one has exhausted the statute's administrative remedies.

However, section 1324a, *"Unlawful employment* of aliens," (italics added) the section that relates to the kind of complaint made by plaintiffs here, is quite different from section 1324b. Section 1324a makes it illegal to hire, recruit or refer for a fee for employment, any *unauthorized alien,* or to hire anyone without complying with certain requirements. Section 1324a does *not* provide for any administrative remedies, nor does it specifically provide for a private right of action after such remedies have been exhausted. Obviously, the section is not directed at the people who might complain about such illegal hirings; rather, it makes such hirings illegal. The section is silent as to what result, if any, there should be if one who makes a complaint to the appropriate authorities about an employer's unlawful hiring practices

is, as a result, intimidated, threatened, coerced, or retaliated against. Does this silence mean that persons making such complaints have been barred from seeking redress under applicable state laws? Obviously not. (*Florida Avocado Growers, supra*, 373 U.S. at pp. 146-147 [83 S.Ct. at p. 1219].)

### 3. *Plaintiffs' Damages Are Not Circumscribed by IRCA's Provisions*

Defendants also contend that IRCA preempts the damages recoverable for wrongful termination in violation of public policy. Just as IRCA does not preempt a state law cause of action for wrongful termination, so too it does not operate to limit the damages recoverable in such an action.

### 4. *The Judgment, Including the Judgment Against Marketer, Is Fully Supported by the Record*

Defendants next contend that the evidence does not support the judgment. In particular, they contend that there was no evidence of an employer/employee relationship between Husband and Marketer, and no evidence that defendants knew that plaintiffs had reported them to the INS. Defendants therefore contend that the award of damages against Marketer for wrongful termination must be reversed, and that, in fact, the entire judgment must be reversed.

Defendants forget that evidence includes inferences that can be drawn from other evidence. The evidence shows that defendants knew that plaintiffs knew the law, knew defendants were violating it, and knew that defendants had violated it vis-à-vis plaintiffs themselves before plaintiffs knew any better. The evidence also shows that Husband had even complained about defendants' use of undocumented employees to a supervisor (who happened to be the brother of one of the owners of defendant companies), and had threatened to complain to the INS. Finally, the evidence showed that, within three months of the INS raid that gutted defendants' work force by 40 percent (when one would assume defendants would need all the remaining employees), defendants laid off *only plaintiffs* because of an alleged lack of work, but then hired more people. The jury reasonably could infer that, while defendants might not have known, to an absolute certainty, that plaintiffs had complained to the INS, defendants nonetheless *believed* plaintiffs were responsible for the raid, and fired them in retaliation.

As to the employer/employee relationship between Husband and Marketer, the evidence showed that although there appear to be two entities, both Marketer and Manufacturer were owned, controlled, and run by the same people, in the same building, using the same employees who were freely

shared between the two companies. The same person was in charge of accounting and personnel for both entities, and was authorized to speak for both. Husband had use of two buying club cards (Costco and Sam's Club) in the name of Marketer (even though Manufacturer also had such cards), which allowed him to buy supplies for Marketer. And both Husband and Wife testified that they did work for both companies.[8]

### 5. The Trial Court Implicitly Rejected the Evidence of Juror Misconduct

Defendants contend that the judgment must be reversed because of juror misconduct. Specifically, after the trial, Juror No. 3 signed a declaration stating that the jury considered the opinion of Juror No. 7, a clinical therapist, about whether plaintiffs would benefit from therapy and/or medication, and the potential cost of such treatment. Apparently Juror No. 7 opined that a year of therapy might be helpful to plaintiffs, that therapy ran about $80 per session, and that Prozac might be a helpful medication. Defendants made a motion for a new trial based on this issue, which motion was denied.

■ " '[O]n review of an order denying a new trial an appellate court has the obligation to review "the entire record, including the evidence, so as to make an independent determination whether the error was prejudicial." [Citations.]' " (*Jones v. Sieve* (1988) 203 Cal.App.3d 359, 368 [249 Cal.Rptr. 821], quoting *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 416, fn. 10 [185 Cal.Rptr. 654, 650 P.2d 1171].) However, the question of the credibility of the witnesses is up to the trial court in the first instance. (*People v. Hernandez* (2000) 22 Cal.4th 512, 526, fn. 3 [93 Cal.Rptr.2d 509, 994 P.2d 354]; *Dailey v. Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 745 [87 Cal.Rptr. 376, 470 P.2d 360].)

Here, the trial court denied the motion for a new trial, without making any findings. " 'An order is presumed correct; all intendments are indulged in to support it on matters as to which the record is silent, and error must be affirmatively shown.' [Citation.] We must 'view the record in the light most favorable to the trial court's ruling and defer to its findings of historical fact, whether express or implied, if they are supported by substantial evidence.' [Citation.]" (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1046 [90 Cal.Rptr.2d 607, 988 P.2d 531].) Implicit in the order denying the motion for

---

[8]Wife was impeached with her deposition testimony, in which she had stated she worked for Manufacturer, but not Marketer. Of course, the jury was free to decide that she had been confused or mistaken in her deposition testimony, particularly because the questions and answers had to be translated because she spoke no English, and the lawyers did not speak the applicable Chinese dialect.

a new trial is a finding that the declarant was not credible.[9] Such an implicit finding is sufficient to support the trial court's order denying the motion for a new trial.

DISPOSITION

The judgment is affirmed. Plaintiffs are awarded their costs on appeal.

Kitching, J., and Fidler, J.,* concurred.

Appellants' petition for review by the Supreme Court was denied August 29, 2001.

---

[9]At the hearing, the trial court discussed whether the alleged misconduct caused any prejudice, and did not mention the declarant's credibility. However, it is settled that a trial judge's oral remarks or opinions, not embodied in the written findings or judgment, may not be used to impeach the findings or judgment. (*City and County of San Francisco v. Givens* (2000) 85 Cal.App.4th 51, 54 [101 Cal.Rptr.2d 859]; *Halagan v. Ohanesian* (1967) 257 Cal.App.2d 14, 21 [64 Cal.Rptr. 792], and cases cited there.)

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.