Filed 1/30/14  P. v. Trujillo CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B246471 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA 069566) |
| v. | |
| DANIEL TRUJILLO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Cynthia L. Ulfig, Judge.  Affirmed as modified.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson, and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

**SUMMARY**

Defendant Daniel Trujillo contends his convictions of attempted voluntary manslaughter and discharge of a firearm with gross negligence must be reversed because two jurors prejudged the case, violating his constitutional right to trial by an impartial jury. His claim is based on an affidavit from another juror stating, among other things, that shortly after deliberations began, two jurors (one of them the foreperson) "both stated that they knew [defendant] was guilty from the minute they walked into the courtroom, and decided he was guilty before the trial even started." The trial court refused to grant a new trial based on jury misconduct, finding the allegations in the juror affidavits did not present evidence of misconduct and reflected bias in *favor* of defendant.

We order a modification of the judgment and corrections to the abstract of judgment that are undisputed by the parties, and otherwise affirm the judgment.

**FACTS**

### 1. The Crimes

The prosecution's evidence showed that Vincent Villa, the victim in this case, drove to Santa Clarita to see Stephanie Diaz, the mother of his young son. Mr. Villa and Ms. Diaz were intimate, but their relationship was not exclusive, and Mr. Villa's visit was not expected. When he arrived, he parked and went to her mobile home. He found Ms. Diaz in bed watching television with defendant. Ms. Diaz started yelling at Mr. Villa, and her roommate, Alejandra Valdez, told Mr. Villa to leave.

Mr. Villa turned and was walking out the door when defendant got up and grabbed a rifle, similar in appearance to an AR-15 rifle. Defendant suggested they go outside, and Mr. Villa heard a clicking sound and saw defendant make a motion as though he were loading the rifle. Mr. Villa walked directly to his car, where he kept a .32-caliber semiautomatic handgun. There were three rounds in the magazine, and he loaded a round into the chamber. Mr. Villa looked over his shoulder and saw a muzzle flash, put his head down and began driving away. He heard about 13 gunshots and felt impacts to his back, the top of his neck and his right index finger. He drove until he saw a Jiffy Lube, parked behind it and called 911, then lost consciousness. Mr. Villa's car had bullet holes

in the side, the driver's side window, the front windscreen, the rear window on the driver's side, the glove box, the dashboard, the driver's headrest, one of the wheels, and the rear window, and the front windshield glass was shattered.

Mr. Villa said he did not bring his gun into Ms. Diaz's residence, and did not fire it or raise it at any time during the incident. Ms. Diaz said Mr. Villa had a gun tucked into his waistband when he came in; that he was angry, and he and defendant started arguing; that Mr. Villa left after about five minutes; and that she unsuccessfully tried to restrain defendant from walking out of the bedroom with the rifle.

One of Ms. Diaz's neighbors, a child living in mobile home unit 314, was awakened by the sound of gunshots and went into his mother's room. The next day, he found bullet holes in his bedroom window and his mattress. The police found eight bullet holes in that mobile home. Another neighbor, who was familiar with firearms, heard 10 to 12 gunshots; saw a white car drive out of the trailer park complex; and called 911. He thought nine or ten shots came from a high-caliber firearm, and two or three came from a lower caliber firearm. The police found no bullet holes in Ms. Diaz's unit or any of the mobile homes surrounding her unit, and no evidence that a gun had been fired in that direction. Detective Adam Dorman searched Mr. Villa's car at the tow yard and found no indication that a gun had been fired from inside the car.

Deputy Sheriff Chris Craft found Mr. Villa near the Jiffy Lube after receiving a report about a gunshot victim, and found his car with multiple bullet holes and the windows shot out. He found a loaded .32-caliber handgun under the driver's seat, with two live rounds in the magazine and one round in the chamber, with the hammer in a firing position. Deputy Craft found no shell casings in the car or its immediate vicinity. He then went to the mobile home park and found three shell casings near Ms. Diaz's mobile home; they appeared to be rifle rounds.

Ms. Diaz told police that she moved to Victorville a few days after the shooting, and that defendant came to her new apartment and threatened her with a gun because he wanted to be sure he could trust her; she assured defendant she would not tell anyone about the shooting.

3

Detective Patrick O'Neill arrested defendant in Victorville a few months later, and defendant denied any involvement in the shooting. While defendant was in jail after his arrest, he made a recorded telephone call in which he said he was "not here for acting good. You know, I'm not here for being on good behavior."

## 2. The Trial

Defendant was charged with the willful, deliberate, premeditated attempted murder of Mr. Villa (count 1, Pen. Code, §§ 664, 187, subd. (a)),[1] and accompanying firearm use allegations (§ 12022.53, subds. (c) & (b)); assault with a firearm (count 2, § 245, subd. (a)(2)); shooting at an occupied motor vehicle (count 3, § 246); and discharging a firearm with gross negligence (count 5, § 246.3, subd. (a)).

At trial, the parties stipulated that defendant was present at Ms. Diaz's residence, and that defendant was the person who fired a gun at Mr. Villa while defendant was standing outside of Ms. Diaz's mobile home.

The facts we have recited were elicited, and defendant then testified on his own behalf. He said that Ms. Diaz had told him Mr. Villa was violent and had a temper. Ms. Diaz had described to defendant several incidents in which Mr. Villa had hit Ms. Diaz or otherwise acted aggressively toward her, and she told defendant that Mr. Villa always carried a gun and had committed a driveby shooting. This information alarmed defendant, so he brought an AR-15 rifle with him when he came to stay at Ms. Diaz's residence.

When Mr. Villa appeared with a gun in his waistband on the night of the shooting, defendant was scared. Mr. Villa was waving his gun around, his voice got louder and louder, and when it seemed Mr. Villa was not going to leave, defendant stood up and grabbed his rifle. Mr. Villa went outside. Defendant went outside because he was afraid Mr. Villa would come back and shoot into or at Ms. Diaz's mobile home. Defendant was worried that Mr. Villa had not left yet, and feared for Ms. Diaz, her roommate Ms. Valdez and Ms. Valdez's children, all of whom were inside the mobile home. When

---

[1]    All undesignated statutory references are to the Penal Code.

defendant went outside, Mr. Villa was facing defendant and walking backwards towards the parking lot.

Mr. Villa got in his car. Defendant thought Mr. Villa was going to leave, but he stuck his hand out of the driver's side window, and there was a muzzle flash. Defendant thought Mr. Villa was shooting at him as something flew by his face. Defendant squeezed the trigger of his rifle "like there was no tomorrow." Mr. Villa continued shooting at defendant, three or four times, and then drove away. Defendant was not trying to kill Mr. Villa.

Ms. Diaz testified she had told defendant about the several incidents involving Mr. Villa's violent behavior.

Ms. Valdez testified that Mr. Villa had a gun in his waistband. Ms. Diaz was screaming at Mr. Villa. Defendant looked mad, and Mr. Villa looked like he was in shock. Ms. Valdez told Mr. Villa he should leave, and about a minute later, Mr. Villa left. She did not see either man point a gun at the other. When she later looked out the door, Mr. Villa was still standing outside and looked like a zombie.

Detective O'Neill was shown a photograph of the driver's side rear passenger door of Mr. Villa's car, and acknowledged he could not tell from the photograph whether the bullet hole depicted was caused by a bullet fired from outside or inside the car.

The jury found defendant not guilty of attempted murder, but guilty of the lesser included offense of attempted voluntary manslaughter. The jury found true an allegation that defendant personally and intentionally discharged a firearm within the meaning of section 12022.5, subdivision (a). The jury also found defendant guilty of discharging a firearm with gross negligence (count 5), but not guilty of assault with a firearm (count 2) and shooting at an occupied motor vehicle (count 3). The jury was polled and each juror affirmed that this was his or her verdict.

### 3.     The Posttrial Motions

A few weeks after the verdicts were returned, defendant petitioned to unseal confidential juror information. His petition was supported by a declaration from counsel recounting interviews with jurors that suggested three other jurors believed defendant

5

was guilty of all charges from the outset and nothing could be done to change their minds, "essentially thwarting any deliberations." The trial court denied the petition, finding defendant failed to make a prima facie showing of good cause for the release of juror information.

Several months later, defendant filed a motion for a new trial, supported by three juror affidavits. Defendant argued the affidavits were admissible as statements of overt acts that were open to sight and hearing and subject to corroboration, not statements related to the jurors' subjective reasoning processes; that the court "should exercise its discretion and conduct an evidentiary hearing to determine whether the extent of the misconduct requires a new trial"; and that when misconduct is found, prejudice is presumed "unless the Prosecution can rebut this presumption," and "despite the presumption of prejudice, this Court should be offended that seated Jurors in this case decided Mr. Trujillo's guilt before the trial even began."

The supporting affidavits were as follows.

**Juror A.P.V.**

Juror A.P.V. stated that, immediately after the jury began to review the evidence, and before any meaningful discussion about what the evidence showed, Juror No. 4 (described as a white, heavyset female) "became very defensive and argumentative." Both Juror No. 4 and Juror No. 1 (the foreperson) "were adamant that Mr. Trujillo should be convicted of Attempted Murder, even though the other Jurors believed the case for Self Defense had been proven." Juror No. 4 "at all relevant times was hostile and argumentative toward all the other Jurors to the point that Juror Number 4 stated that if all the other Jurors voted for Self Defense, the Jury would be hung, because she would not vote for Self defense." When Juror No. 4 "made her position known, the other jurors attempted to engage [her] in the deliberative process and support their position by their view of the evidence, but were met with crazed behavior, which included pushing her chair around the Jury Room and raising her voice in an aggressive tone." After "approximately 20 minutes into the process," Jurors No. 4 and No. 1 "both stated that they knew Mr. Trujillo was guilty from the minute they walked into the courtroom, and

6

decided he was guilty before the trial even started." The other jurors "attempted to deliberate with Juror Number 4, and were met with the following response: 'I don't care what you say, he's guilty,' " adding that "she lived in Santa Clarita, CA and that 'we can't have that kind of person in our neighborhood.' "

Juror A.P.V. stated that, on the second day of deliberations, "the jury members began to realize that they were not going to reach a verdict and began to negotiate a mutually agreed upon verdict." While doing so, "they resumed their deliberations and when Juror Number 4 was given the opportunity to express her views and deliberate," she "appeared to be asleep, or possibly pretending to be asleep." At some point, both Juror No. 1 and Juror No. 4 "stated that a vote of perfect self defense would mean that [defendant] would not learn his lesson, and added that the law as it pertained to the case was flawed." Then, the two jurors "advised the other members of the Jury that they should make their own rules for the case."

After the verdict was negotiated, Juror No. 1 read the gun use allegation, "and informed the entire Jury that Mr. Trujillo was obviously guilty of the special allegation and that we had to vote True because Mr. Trujillo was found Guilty." Juror No. 1 recorded the "True" vote without the jury voting on the allegation.

Juror A.P.V. stated she "was intimidated by the hostile behavior" of Juror No. 1 and Juror No. 4 "when the subject of possibly voting Not Guilty was discussed. I did not feel free to deliberate or to speak my mind during the deliberation process." Juror A.P.V. further stated that she "was not aware that I could have advised the Court that the verdict regarding the special allegation did not represent my vote. I felt that I had to remain silent because I had agreed with the overall verdict and also believed that the negotiated verdict would result in a sentence of less than 2 years."

**Juror J.O.**

Juror J.O.'s affidavit stated that Juror No. 1 was selected as the foreperson. Another white female juror (the Juror) "was very hostile and not willing to deliberate or to allow others to deliberate." The Juror stated, " 'What!, do you think he is innocent; no one who is innocent walks around with an AR-15 rifle.' " At some point, the foreperson

7

stated, " '[w]hich one of you dumb asses thinks [defendant's] going to walk out of here free?' " and " 'I decided Trujillo was guilty before walking into this room to deliberate.' " Juror J.O. "felt in fear for [his] life because of the aggressive tone and demeanor taken by the Foreperson, the Juror and Juror No. 7." When it appeared there would be a hung jury, the members "decided they would reach a compromised verdict. The Foreman completed the verdict form, but never asked whether we were all in agreement that the gun allegation was true." During the jury polling in open court, "I felt like I had to say yes because I had agreed with the verdict. I never voted or agreed to a 'true' finding on the allegation."

### Juror M.P.

Juror M.P.'s affidavit stated that shortly after deliberations began, a heavy set white female (the Juror) stated, " 'I'm voting Guilty. If anyone argues with me there is going to be a hung jury, and I'm not going to talk about it.' " Then the Juror "proceeded to sit on her hands and did contribute [*sic*] to the deliberation process." When other jurors began to discuss the facts and the law, the Juror stated, " 'I can't believe you guys are going to let him walk free.' " "[W]hen other Jury members engaged the Juror in any discussion, she appeared to focus solely on the evidence relating to the bullets holes in Unit 316. The Juror made it clear that the evidence of the bullet holes in unit 316 was reason enough to find Mr. Trujillo guilty and that that evidence was enough to not allow Mr. Trujillo to 'walk free'." The Juror "then resigned herself to not exchange ideas or to discuss the case." "On at least three or four occasions the other jury members attempted to engage the Juror in deliberation, but the Juror responded by yelling at me and another Juror . . . and stating that she was voting guilty regardless of what occurred during the deliberations." Another juror (Juror A.P.V.) confided to Juror M.P. that she was physically afraid of the Juror.

Juror M.P. further stated that, after the jury submitted a question to the court, the foreperson said the jury "should not have asked the Judge to clarify anything because the Jury members have the authority to interpret the law as we wished."

Juror M.P. believed the district attorney "failed to prove his case, and that a verdict of complete Self Defense was just and proper," but when she expressed that view, "the Juror accused [her] of 'protecting' Mr. Trujillo because of my position . . . as a Case Worker for 'at risk' youth." At some point, "the Jury decided that they should reach a compromised verdict, and after doing so, the Foreperson completed the verdict forms and I was never asked to vote on the special allegation regarding the gun use. When polled about my verdict, I knew I could say no, but was scared that the court was going to re-try the case with a 'worse' jury than what we had and I wanted to save him as much as I could with my power as a juror on the case."

The prosecutor filed a written opposition to the motion for a new trial, and in the alternative a motion to unseal confidential juror information. The prosecutor argued that no misconduct had been shown, but that if the court were inclined to hold a hearing to determine whether there was juror misconduct, the court should unseal and release the confidential juror information for all the jurors so that the nonaffiant jurors could be interviewed.

### 4. The Trial Court's Ruling

The court accepted the three juror affidavits as evidence in support of defendant's motion for a new trial, but found the juror affidavits did not show misconduct. We quote the court's findings at some length.

"The court does not find that the stated allegations . . . present evidence of misconduct. There is no evidence presented in the affidavits that indicates that any of the jurors failed to disclose pertinent information regarding their suitability to serve as jurors, nor that they lied about their information or had any preconceived bias or prejudice in favor of or against either side.

"There is no evidence presented that the jurors received information outside of the courtroom proceedings by reading newspaper accounts nor having heard statements by the bailiff or anyone else in the courtroom.

"[T]here is no evidence the jury conducted any independent investigation or entered into any other type of misconduct.

"There's no evidence contained in the affidavit that the decision was reached by the jury by chance or by the drawing of lots; in fact, the jurors were out deliberating for over two days.

"In addition, they sent requests out to the court for the readback of testimony of the witnesses and for clarification of instructions.

"From all the evidence, the court had ample time of the deliberations, these jurors were working hard and trying to reach a fair and just verdict based on the evidence presented to them at trial.

"On the other hand, the wording and sentence structure contained in the three affidavits appears to have been written by someone other than the jurors themselves. Language in the first paragraph and the first two sub points is identical in each.

"The language is so identical that the sworn affidavit of [Juror J.O.] . . . , a male juror, the first paragraph reads beginning at line 3, and I quote, 'making this her statement and affidavit under oath and affirmation of belief and personal knowledge that the following matters, facts, and things set forth are true and correct to the best of her knowledge.' [¶] . . . [¶]

"In reviewing the claims made in the affidavit, the court is mindful of the requirements set forth in Evidence Code section 1150.[2] The courts have always been cautioned that when a juror in a course of deliberation gives a reason for his or her vote, the words are simply a verbal reflection of the juror's mental process. It appears that the statements attributed to the other jurors are just that, a statement of their mental process.

"In addition, the statements made in the affidavit of [Juror A.P.V.] at paragraph 5, and I quote, 'The other jurors believe the case for self-defense had been proven.' This

---

**2** Under Evidence Code section 1150, subdivision (a), "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

comment causes the court to have pause because if indeed that were the true opinion of all the jurors, they would have had no choice but to vote not guilty on all the charges.

"In her affidavit, that juror further goes on to state at paragraph 16 that she believed the special allegation regarding the gun would result in a sentence of less than two years.

"Unless she has done some research on her own, been told by defense counsel or his investigator that that enhancement carries a term of three, four or 10 years, she would have no way of knowing that her misconception was not true.

"In the affidavit of Juror [M.P.], it also appears that she had an agenda, and that was to mitigate defendant's guilt based on the statement that the case would be retried and quote 'worse' unquote jurors could hear the case.

"The conduct of Jurors No. 1 and 4 in stating their opinions and thought process early in the deliberation may have been rude or have hampered the initial deliberation process, and they obviously failed to heed the jury instruction and advice not to do so.

"But in light of the fact the jurors were out over a two-day period, that in the course of two days they did send out questions and that the three jurors who submitted their affidavits nor any of the other remaining jurors raised issues regarding the conduct of Jurors No. 1 and 4 and their statements of their deliberative process, the court is satisfied that a fair verdict was rendered and that the verdicts reflected a fair expression of opinion on the part of the jurors.

"The court would note having heard the evidence that the defendant may well have been convicted of all the charges as pled; and that, if anything, he received a more favorable verdict than would otherwise have been rendered.

"Further, from the affidavits, the fact that is clear to the court is that these three jurors are now considering punishment which they were specifically told not to do so. These jurors are also showing a bias in favor of the defendant. Again, the bias can be for either the defense or for the People."

After describing the evidence and observing that the jury, from the evidence presented, "may well and could have" found the defendant guilty of attempted,

11

deliberate, premeditated murder, and that it was clear the defendant did not act in self-defense, the court continued:

"As to the three jurors' allegations that the finding that the defendant was personally armed and used a gun was not their verdict or there had not been a vote on the issue is ludicrous. It sounds to the court that after hearing the prison time, the prison time that the Legislature has determined for the use of the gun under these circumstances, that these jurors do not like or disagree with that; and, therefore, want to return a verdict based on penalty and punishment and not on the conduct of the defendant. [¶] The evidence in this case was clear. The gun was used, the gun was the defendant's gun, he brought it down from Bakersfield, he reassembled it in the mobile home park and made it ready for use. This testimony of the victim Mr. Villa, Stephanie Diaz and Alejandra and the defendant himself, is that he used and shot the gun. Any finding other than the fact that he personally used a firearm within the meaning of Penal Code section 12022.5 as alleged would be contrary to the facts presented in the case."

The court then denied the motion for a new trial, "and the motion for the disclosure of juror identification information is also denied based on those reasons."

The court sentenced defendant to a total of 15 years 6 months in state prison (the upper term of 66 months on count 1, plus 10 years for the firearm enhancement (§ 12022.5)). The sentence on count 5 was imposed and stayed under section 654. The court ordered defendant to pay an $80 court security fee (§ 1465.8) and a $240 restitution fine (§ 1202.4), and imposed and stayed a $240 parole revocation restitution fine (§ 1202.45). Presentence custody credits were awarded and other orders made that are not at issue on appeal.

## DISCUSSION

### 1.    Juror Misconduct

Defendant contends on appeal he should have a new trial because two jurors prejudged the case, violating his federal and state constitutional rights to trial by an impartial jury. We disagree.

12

### a.    The applicable principles

The pertinent principles may be summarized as follows.

First, under section 1181, the court may grant a defendant's application for a new trial "[w]hen the jury has . . . been guilty of any misconduct by which a fair and due consideration of the case has been prevented," or "[w]hen the verdict has been decided by lot, or by any means other than a fair expression of opinion on the part of all the jurors . . . " (§ 1181, subds. 3 & 4.)

Second, "the initial burden is on defendant to prove the misconduct." (*In re Carpenter* (1995) 9 Cal.4th 634, 657.)

Third, a trial court "may hold an evidentiary hearing when jury misconduct is alleged in a new trial motion, but the court may also, in its discretion, conclude that a hearing is not necessary 'to resolve material, disputed issues of fact.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1267.)

Fourth, " ' "[t]he determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1210; cf. *Jie v. Liang Tai Knitwear Co., Ltd.* (2001) 89 Cal.App.4th 654, 666-667 [on review of an order denying a new trial based on juror misconduct, "the question of the credibility of the witnesses is up to the trial court in the first instance"; where the trial court made no findings, "[i]mplicit in the order denying the motion for a new trial is a finding that the declarant was not credible"].)

Fifth, a statement showing a juror has prejudged the case is a statement of bias, and "a statement of bias is misconduct because bias is misconduct." (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 788, 791 (*Grobeson*) [juror's statement that she had made up her mind during the trial was a statement of bias showing she had prejudged the case and thus had committed misconduct]; see also *People v. Hedgecock* (1990) 51 Cal.3d 395, 419 ["In rare circumstances a statement by a juror during deliberations may itself be an act of misconduct, in which case evidence of that statement is admissible," citing *In re Stankewitz* (1985) 40 Cal.3d 391, 398]; *People v. Lewis* (2001) 26 Cal.4th

334, 389 [Evidence Code section 1150, subdivision (a) "does not prohibit admitting a statement that reflects a juror's reasoning processes if the statement itself amounts to juror misconduct"].)

Sixth, "if it appears substantially likely that a juror is actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict." (*In re Carpenter, supra,* 9 Cal.4th at p. 654 ["A biased adjudicator is one of the few 'structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards' "]; see *id.* at p. 655 ["once actual bias is found, the strength of the evidence is irrelevant; the verdict must be set aside"]; see also *People v. Nesler* (1997) 16 Cal.4th 561, 581 ["if a juror's partiality would have constituted grounds for a challenge for cause during jury selection, or for discharge during trial, but the juror's concealment of such a state of mind is not discovered until after trial and verdict, the juror's actual bias constitutes misconduct that warrants a new trial under Penal Code section 1181, subdivision 3"].)

### b. This case

Defendant's claim on appeal is straightforward. He relies primarily on Juror A.P.V.'s affidavit stating that two other jurors, during deliberations, "both stated that they knew Mr. Trujillo was guilty from the minute they walked into the courtroom, and decided he was guilty before the trial even started." That affidavit stands uncontradicted, and so, defendant tells us, "there were no factual resolutions of conflicting affidavits to be made by the trial court" and the presumption of prejudice that arises from jury misconduct is unrebutted.[3]

---

[3] Defendant also cites Juror J.O.'s affidavit declaring that the foreperson, Juror No. 1, "also stated the following: 'I decided Trujillo was guilty before walking into this room to deliberate.' " This statement, if made, would not establish misconduct. "The reality that a juror may hold an opinion at the outset of deliberations is . . . reflective of human nature. It is certainly not unheard of that a foreperson may actually take a vote as deliberations begin to acquire an early sense of how jurors are leaning. We cannot reasonably expect a juror to enter deliberations as a *tabula rasa,* only allowed to form ideas as conversations continue." (*People v. Allen & Johnson* (2011) 53 Cal.4th 60, 75.) With the exception of the statements discussed in the text, the affidavits alleged no

14

There is a fundamental flaw in defendant's theory. Standing alone and if believed by the trial court, the juror statements reported by Juror A.P.V. might well be found to be statements of bias, "show[ing] that [they] had prejudged the case and thus had committed misconduct." (*Grobeson, supra,* 190 Cal.App.4th at p. 791; see *id.* at p. 784 [affirming trial court's grant of a new trial based on a juror's statement of bias; the trial court found the juror had made a statement during the trial that she had "made up my mind already"].) But in this case, unlike *Grobeson*, the trial court did *not* conclude that the jurors had made the statements Juror A.P.V. attributed to them. While, as defendant points out, the trial court did not specifically address Juror A.P.V.'s averment that two jurors said they had decided defendant was guilty before the trial started, the trial court did expressly find the affidavits did not "present evidence of misconduct."

More importantly, the trial court expressly discredited other statements in Juror A.P.V.'s affidavit on multiple grounds. The court found all three affidavits appeared to have been written by someone other than the jurors themselves. The court said Juror A.P.V.'s statement that the other jurors believed self-defense had been proven "causes the court to have pause," because if true those jurors "would have had no choice but to vote not guilty on all the charges," by which we understand the court to mean it discredited the statement that others jurors found self-defense had been proven. The court reasoned that Juror A.P.V. would have no reason to know she misconceived the length of the sentence on the gun allegation unless she had received information outside the courtroom that she was not allowed to consider, and observed that all three jurors were "considering punishment" contrary to instructions and "showing a bias in favor of the defendant." The court characterized the statements in all three juror affidavits that the finding defendant was personally armed and used a gun "was not their verdict" as "ludicrous," because no other verdict would have been possible on the evidence

conduct by Juror No. 1 demonstrating he did not "maintain an open mind, consider all the evidence, and subject any preliminary opinion to rational and collegial scrutiny before coming to a final determination." (*Ibid.*)

15

presented. And the court pointed out that, while the jurors sent out questions over the two-day period of deliberations, none of the jurors raised any issue about the conduct or statements of Juror No. 1 and Juror No. 4.

In short, it is plain the trial court gave no credence to the affidavits in support of the new trial motion, and that prevents this court from doing so. This case is the mirror image of *Grobeson*, where the trial court granted a new trial, crediting declarations that a juror had said she had made up her mind during trial. This court said: "Since the trial court found [the declarant's] declaration to be credible, we must accept that decision. [Citation.] This is not the forum for reweighing [the declarant's] credibility." (*Grobeson, supra,* 190 Cal.App.4th at p. 796.) The same is true here. This is not the forum for reweighing the trial court's finding that the juror affidavits, including the affidavit of Juror A.P.V., were not credible. There is no basis upon which we may reverse the trial court's conclusion there was no showing of juror misconduct, and no need to conduct an evidentiary hearing on the point. (*People v. Steele, supra,* 27 Cal.4th at p. 1267 [court may, in its discretion, conclude a hearing is not necessary to resolve disputed issues of fact].)

We should also point out that, unlike the case in *Grobeson* and other cases defendant cites finding misconduct based on juror bias, the statements Juror A.P.V. and the other jurors claimed to have heard occurred during deliberations. (See *Grobeson, supra,* 190 Cal.App.4th at p. 784 [in the middle of the trial, one juror told another she had made up her mind already]; *Deward v. Clough* (1966) 245 Cal.App.2d 439, 443 [before hearing argument or instruction, juror was heard saying, " 'I don't see why they don't open up the jury room now. We could bring in a verdict already.' "]; *People v. Brown* (1976) 61 Cal.App.3d 476, 479 [one juror told another, in reference to the defendant and before the prosecution had completed its case, that "[h]e is guilty" and "[t]here is no doubt about it."].)

While Evidence Code section 1150 allows evidence of statements made within or without the jury room, it is only in "rare circumstances" that a statement by a juror during deliberations "may itself be an act of misconduct . . . ." (*People v. Hedgecock, supra,* 51

16

Cal.3d at p. 419.)  A statement during deliberations that appears to show bias could well be a juror's misguided rhetorical attempt to persuade other jurors to his point of view.  In short, there are good reasons to be cautious when alleged statements of bias made during deliberations form the only basis for a claim of misconduct.  (Cf. *People v. Allen & Johnson, supra,* 53 Cal.4th at pp. 66, 73 [discharge of juror was improper; juror comment during deliberations that, " '[w]hen the prosecution rested, she didn't have a case,' " was "subject to some interpretation" and "did not indicate an intention to ignore the rest of the proceedings"; court had found no case "in which a juror was discharged for prejudgment based solely on comments made during deliberations"].)

In sum, the trial judge here carefully considered the evidence of jury misconduct presented to it, found the evidence wanting, and denied defendant's motion for a new trial.  We see no error.

### 2.    The Abstract of Judgment

A modification of the judgment and several corrections to the abstract of judgment are necessary and are undisputed by the parties.

First, the abstract must be corrected to show defendant was convicted on count 1 of attempted voluntary manslaughter (§§ 664, 192, subd. (a)), rather than attempted murder.

Second, the abstract must be corrected to show a court security fee of $80 as imposed by the court, rather than the $40 shown on the abstract.  (See § 1465.8, subd. (a)(1) ["To assist in funding court operations, an assessment of forty dollars ($40) shall be imposed on every conviction for a criminal offense"]; see *People v. Roa* (2009) 171 Cal.App.4th 1175, 1181 ["because appellant was convicted on two counts, two such fees should have been imposed"].)  Here, the trial court imposed the proper assessment of $80 for defendant's two convictions, but the abstract of judgment erroneously reflects a $40 fee.

Third, the trial court failed to impose a $30 assessment for each of defendant's convictions (a total of $60) under Government Code section 70373, subdivision (a)(1).  That section states:  "To ensure and maintain adequate funding for court facilities, an

17

assessment shall be imposed on every conviction for a criminal offense . . . .  The assessment shall be imposed in the amount of thirty dollars ($30) for each misdemeanor or felony . . . ."  The judgment must be modified and the abstract of judgment corrected accordingly.

## DISPOSITION

The judgment is modified by imposing two $30 criminal conviction assessments under Government Code section 70373, subdivision (a)(1).  As modified, the judgment is affirmed.  The superior court shall prepare and transmit to the Department of Corrections and Rehabilitation a new abstract of judgment, amended to show:  (1) defendant was convicted on count 1 of attempted voluntary manslaughter (§§ 664, 192, subd. (a)); (2) an $80 court security fee (§ 1465.8); and (3) a $60 criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)).


                                                                    GRIMES, J.

We concur:


BIGELOW, P. J.



RUBIN, J.


18